426 So.2d 574 (1982)
MONSANTO AGRICULTURAL PRODUCTS COMPANY, Appellant,
v.
Clinch EDENFIELD, Appellee.
No. AH-485.
District Court of Appeal of Florida, First District.
November 16, 1982.
Rehearing Denied February 8, 1983.
*575 Michael I. Coulson of Howell, Howell, Liles, Braddock & Milton, Jacksonville and John Q. McShane and John L. Krenn of Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for appellant.
Marlin M. Feagle, Lake City, for appellee.
THOMPSON, Judge.
Monsanto Agricultural Products Company (Monsanto) appeals a judgment entered on appellee's complaint alleging negligence and breach of express and implied warranties in connection with the manufacture and sale of its herbicide product, Lasso. We reverse in part and affirm in part.
Monsanto manufactures Lasso herbicide and sells it to distributors who in turn resell it to dealers or directly to farmers. Appellee Clinch Edenfield is a Columbia County farmer who purchased Lasso from local farm supply dealers for use in controlling weeds in his 1978 soybean crop. Appellee purchased the Lasso in sealed five gallon cans which bore on their labels and on the face of instruction booklets affixed to their tops the legend "LIMIT OF WARRANTY AND LIABILITY." Below this legend as it appeared on the label of each can was a statement of express warranty of merchantability (warranty of chemical composition and fitness for purposes described in the directions for use of the product), which included in bold face type the statement "NO OTHER EXPRESS OR IMPLIED WARRANTY OF FITNESS OR MERCHANTABILITY IS MADE." The statement of express warranty thereafter limited liability for breach of warranty to refund of purchase price of the product. The reference to warranty and liability which appeared on the face of the instruction booklet affixed to the top of each can of Lasso read as follows:
Read "LIMIT OF WARRANTY AND LIABILITY" before buying or using. If terms are not acceptable, return at once unopened.
Although the evidence was conflicting as to whether appellee followed accepted farming practices in planting his crop, and as to whether he applied the product in accordance with the directions, there was no genuine dispute that appellee's weed control program failed. By the time appellee's soybean plants had grown to a height of some three to four inches, weeds began to appear in the field, and by the time the plants were 12 inches high the weeds had begun to choke them and stifle their growth. Appellee then elected to plow the crop under and replant, but the second crop also failed, either because the optimum planting time had passed or because of drought conditions which occurred during the latter part of the 1978 growing season. Appellee thereafter instituted this action, alleging breach of express and implied warranties of merchantability, breach of implied warranty of fitness for a particular purpose, negligent manufacture, and negligent failure to instruct as to proper use and application of the product. The complaint included no allegation that the herbicide had in any way caused direct damage to appellee's soybean plants, either because of a defect in the Lasso or because of improper application due to the alleged failure to provide adequate instruction. Rather, the complaint alleged only that the Lasso failed to control weeds, and that as a result of the ineffectiveness of the product, the weeds competed with the soybean crop for available nutrients, thereby damaging the crop.
During a charge conference and motion hearing conducted at the close of plaintiff/appellee's evidence, the trial judge correctly ruled that the allegation of breach of implied warranty of merchantability was *576 identical to, and encompassed within, the allegation of breach of express warranty, and that appellee had failed to adduce any evidence in support of the allegation of negligent manufacture. He directed a verdict for appellant on these counts. However, the trial judge denied appellant's motion for directed verdict on the remaining negligence count, and thereafter instructed the jury on negligence. This was error. The damage to appellee's crop was not directly caused by any vice or defect in the herbicide, but was consequential damage indirectly caused by the product's ineffectiveness. Tort law imposes upon manufacturers a duty to exercise reasonable care so that the products they place in the marketplace will not harm persons or property. However, tort law does not impose any duty to manufacture only such products as will meet the economic expectations of purchasers. Such a duty does, of course, exist where the manufacturer assumes the duty as part of his bargain with the purchaser, or where implied by law, but the duty arises under the law of contract, and not under tort law. Prosser, Law of Torts § 101 (4th Edition 1971); Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P.2d 145 (1965); Clark v. International Harvester Co., 99 Idaho 326, 581 P.2d 784 (1978). Further, there was no evidence that Monsanto's alleged failure to instruct as to proper use and application of the product was the legal cause of any damage sustained by appellee. Accordingly, we reverse that portion of the judgment holding Monsanto liable to appellee on grounds of negligence.
With respect to the allegations of breach of warranty, we find that there was adequate, competent, and substantial evidence in the record to support the jury's determination that the herbicide failed to control the weeds in appellee's soybean field, and that Monsanto thereby breached its express warranty of merchantability. However, we conclude that the trial court erred in instructing the jury that Monsanto's limitation of warranty and liability had no legal effect and would not operate to limit the damages recoverable by appellee.
With the demise of the privity doctrine in Florida, manufacturers became liable to remote purchasers for breach of both express and implied warranties. See, e.g., Manheim v. Ford Motor Company, 201 So.2d 440 (Fla. 1967). Although Manheim was decided after Florida's adoption of the Uniform Commercial Code, Chapters 671-679, Fla. Stat., (the UCC) the sale at issue in the case occurred prior to the adoption of the UCC. The Manheim court held that an express warranty limitation did not operate to preclude recovery on the basis of implied warranty where the product was defective and unsuitable for its ordinary and intended use. However, limitations of implied warranties of merchantability and fitness are now expressly authorized by the UCC if said limitations are made a part of the bargain between the parties, are reasonably consistent with any express warranties made, are in writing and are conspicious, and are not unconscionable. Sections 672.302, .316, .719, Fla. Stat. The trial judge's refusal to give effect to Monsanto's limitation of warranty and liability appears to have been based on his determination that the UCC did not apply in this case, based primarily on the authority of Ford Motor Company v. Pittman, 227 So.2d 246 (Fla. 1st DCA 1969), cert. denied, 237 So.2d 177 (Fla. 1970) and Rehurek v. Chrysler Credit Corporation, 262 So.2d 452 (Fla.2d DCA 1972), cert. denied, 267 So.2d 833 (Fla. 1972). Both of these cases involved the sale of dangerous instrumentalities (automobiles) to unsophisticated consumers. In both cases the court also found that the limitation or exclusion of warranty was not conspicious. The Rehurek court found that the disclaimer clause appeared in small print in paragraph six on the back page of the contract and did not comply with § 672.316(2), Fla. Stat., which required that any modification or exclusion of an implied warranty of merchantability mention merchantability, be in writing, and be conspicious. In Ford Motor Company this court held the manufacturer "must prove that the disclaimer clause was in fact a part of that contract, rather than some extraneous matter hidden in a bulk of materials handed to the buyer at the time *577 of purchase." Id. at 249 (footnote omitted). In our view, these cases do not support the trial judge's refusal to apply the UCC in a case such as this, involving a purely commercial transaction between a manufacturer of agricultural chemicals and an experienced and knowledgeable farmer. Furthermore, it appears that in the cited automobile cases the manufacturers were attempting to limit their liability to replacement of defective parts and correction of defective workmanship without regard to whether the automobiles were fit for ordinary use and would perform as advertised. There the manufacturers were attempting to disclaim any warranty of merchantability or fitness for use as a motor vehicle, whether express or implied. Such an attempt to disclaim any warranty of merchantability was clearly invalid under pre-UCC law, and remains invalid under the UCC provisions prohibiting unconscionable contracts or clauses of contracts.
Here, Monsanto has not attempted to disclaim all warranties of merchantability and fitness for intended purposes, but has merely attempted to limit its liability for any consequential damages which might flow from a breach of its express warranty of merchantability and fitness. Monsanto has agreed to return the full purchase price of its product should the product (if used according to directions) fail to perform as advertised. We doubt that the manufacturers involved in the cited automobile cases would have found themselves in court had they promptly offered to replace the defective automobiles or to refund the purchase price.
Although we recognize that herbicide failure may occasionally result in economic loss for commercial farmers such as Mr. Edenfield, and that our decision herein may therefore be considered by some as harsh, we do not think it so. The courts of this state have long recognized the risks and uncertainties of agricultural ventures. See, e.g., Corneli Seed Co. v. Ferguson, 64 So.2d 162 (Fla. 1953), wherein the court held ineffective an attempted disclaimer of implied warranty of variety of seed, but strongly implied in dicta that a disclaimer of implied warranty of quality would be upheld:
[G]rowing conditions and practices have little or no effect upon variety. On the other hand, growing conditions and practices have a definite effect upon quality and productiveness. Consequently, we believe that it is entirely reasonable to uphold a disclaimer or non-warranty clause in a case of variance in quality or productiveness because such variance depends largely upon good husbandry, weather conditions and the like, which are matters almost exclusively under the control of the farmer or are acts of God. Certainly they are circumstances and conditions which are wholly beyond the control of the seed merchant.
64 So.2d at 164. A manufacturer of agricultural chemicals, like a producer of seed, will generally have no knowledge of the field or weather conditions which will obtain when its product is put to use, and certainly has no control over the manner in which its product is applied. Given the uncertainties inherent in agricultural endeavors, and in view of the fact that limitations of warranty and liability are appropriate if made a part of the bargain between the parties, we see nothing unfair or unreasonable about our determination that Monsanto's limitation of warranty and liability should be given effect.
As noted above, Monsanto's statement of warranty appeared on each can of Lasso, as well as in the directions for use of the product, and was captioned LIMIT OF WARRANTY AND LIABILITY rather than with the more reassuring, but misleading, words "guarantee" or "warranty." The actual statement of exclusion of other express or implied warranties mentioned merchantability and was printed in capitals. In our view, this disclaimer was conspicuous, and we so hold.
With respect to the question of whether the limitation of warranty and liability was made a part of the bargain between the parties, we note that the trial transcript reveals an admission on the part of the appellee that he read the Lasso label *578 and directions for use prior to applying the product to his fields. The reference to the limit of warranty and liability which appeared on the face of the booklet of directions for use included an express invitation to purchasers to return the product if the terms of the warranty were unacceptable. In view of appellee's admission that he read the directions, we hold that even if appellee did not know of the limitation of warranty at the time of purchase of the product, it became a part of the bargain between appellee and Monsanto, by virtue of appellee's assent thereto. Pfizer Genetics, Inc. v. Williams Management Co., 204 Neb. 151, 281 N.W.2d 536 (1979); Klein v. Asgrow Seed Co., 246 Cal. App.2d 87, 54 Cal. Rptr. 609 (Cal.3d DCA 1966). We further find that the limitation of warranty and liability was reasonably consistent with the express warranty, and, as set out above, was not unconscionable. This case is reversed and remanded with instructions to the trial court to enter judgment in favor of appellee in the amount of the purchase price paid for the herbicide.
LARRY G. SMITH and JOANOS, JJ., concur.

ON MOTION FOR REHEARING
The appellee has filed a motion for rehearing contending that this court invaded the fact-finding province of the jury by overruling the jury's special verdict, in finding that the Monsanto disclaimer was conspicuous, and in finding Monsanto's limitation of warranty and liability was not unconscionable.
There was no special interrogatory in the jury verdict on the question of whether the limitation of warranty was conspicuous, and the trial judge did not rule on the issue. In addition, § 671.201(10), Fla. Stat., defining conspicuous, provides:
A term or clause is "conspicuous" when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is conspicuous if it is in larger or other contrasting type or color. But in a telegram any stated term is conspicuous. Whether a term or clause is conspicuous or not is for decision by the court. (emphasis added)
The clause "LIMIT OF WARRANTY AND LIABILITY" was in capitals and was conspicuous under the definition of the statute. Whether it is conspicuous is a decision for the court, not the jury. A trial court determination of conspicuousness is reviewable by this court. See Rudy's Glass Construction Co. v. E.F. Johnson Co., 404 So.2d 1087 (Fla. 3d DCA 1981). While it is true that a determination of conspicuousness will ordinarily be made by the trial court first, we declined to remand this case to allow such determination because the trial judge's ruling would be ultimately reviewable in this court in any event.
Appellee contends that the record does not reveal that he read or knew of the limitation of warranty at the time of purchase or prior to the use of the product, and certain testimony is cited in support of that contention. On page 118 of the transcript appellee testified as follows:
Q I said that it clearly states that you are supposed to read the entire label?
A Yes, sir.
Q Before doing anything?
A Yes, sir.
Q And you did that?
A Yes, sir.
Q And it says to read the limited warranty of liability before buying and using, and if terms are not acceptable, return at once unopened?
A I don't know if I read all that.
Q It says read the entire label, right on the front, do you remember reading that?
A I don't remember reading anything about the warranty.
There is testimony that appellee read the entire label. While admitting that he glanced over the entire label and that he read the entire label, he merely stated he did not remember reading the limit of warranty and liability portion. Even if he contended *579 he did not read it, he should be charged with knowledge of a "conspicuous" disclaimer. As stated in Annot., 73 A.L.R.3d 248, 274 (1976):
§ 6. Need to bring conspicuous disclaimer to buyer's attention
UCC § 1-201(10) specifies that a term or clause is conspicuous not when it is actually noticed, but "when it is so written that a reasonable person against whom it is to operate ought to have noticed it." Given the objective nature of this definition, and in light of the fact that § 2-316(2) requires nothing more than conspicuousness, it seems apparent that if an implied warranty disclaimer is otherwise valid under the Code, the buyer cannot avoid its effect by claiming that it was not brought to his attention. In each of the ensuing decisions, the court expressly recognized that an implied warranty disclaimer which satisfies the § 2-316(2) requirement of conspicuousness is effective regardless of whether the buyer was actually aware of it. [footnote omitted]
In support of the contention that this court invaded the province of the jury by finding as a fact that the disclaimer was not unconscionable, the appellee cites as his only authority Majors v. Kalo Laboratories, Inc., 407 F. Supp. 20 (M.D.Ala. 1975). Contrary to appellee's contention, the Majors court, not the jury, determined that the limitation of liability was unconscionable. In addition, Majors states: "Parties agree that the question of conscionability is for the Court." Id. at 21. Although the court in Majors found the limitation of warranty was not conscionable, that case is distinguishable because the court found the defect was a latent one in a product whose effectiveness the manufacturer knew to be questionable. The limitation of warranty in that case was entitled "100% GROWER GUARANTEED" not "LIMIT OF WARRANTY AND LIABILITY" as in this case. Further, in this case there was no jury determination by answer to special interrogatory on the question of whether the limitation of liability was conscionable, although it is contended this court directly overruled the special jury verdict returned at trial.
Appellee contends that this court exercised a fact-finding function and overlooked record facts in finding that Monsanto's alleged failure to instruct as to the proper use and application of the product was not the legal cause of any damage sustained by appellee. Specifically he contends that Monsanto's expert admitted that the manufacturer had known since 1964 that a particular amount of rainfall was required to properly activate the herbicide, and that it was important for the farmer to know what crop had been planted in the field the previous year in determining the use of the herbicide but failed to so instruct the farmer. Monsanto's expert did testify that one-third inch of rainfall or irrigation was needed within five days after application to activate the chemical. This information was in later instructions but was not in the instruction booklet furnished with the chemical when it was purchased by appellee. However, the failure to furnish this information to appellee could not be the reason the chemical failed to kill the weeds and could not be the legal cause of the damage sustained because of the appellee's following testimony:
Q Do you recall how long after you planted before it rained?
A Within two or three days.
Q Were you out at the farm when it rained?
A Yes.
Q Do you know how much rainfall that you got?
A It rained probably a half inch or an inch.
Q After you planted?
A Right.
Transcript at page 70. Therefore by appellee's own testimony, more than enough water to activate the chemical was received within the time recommended in the revised instructions subsequently issued.
Appellee claims it was also negligence for Monsanto to fail to advise the farmer to determine what herbicide had *580 been used the prior year. Monsanto's expert was asked two questions relating to this point. The first question was would it be beneficial for the farmer to know whether the previous farmer had used weed control in an otherwise heavily weed infested area, such as crabgrass and this was answered in the affirmative. Counsel then asked specifically if it would have been advisable or informational for appellee to know that the previous farmer had used weed control in his field, and the expert answered, "It sure would." Transcript at page 174. Although the expert testified that such information would be "beneficial, advisable, or informational" there is no evidence in the record that the lack of this information was the legal cause of any damage to appellee. There is no evidence of an area heavily infested with weeds. Appellee testified regarding the condition of the field prior to plowing and planting as follows:
Q But there were weeds growing or present?
A A normal amount when you get through harvest and there are weeds.
Transcript at page 94. There is no evidence that the prior year's weed crop was the legal cause of any damage to the appellee. He testified in detail to his preparation of the land, including both bottom plowing with a 16 inch plow and harrowing and that he turned the ground under with a 16 inch plow two weeks prior to planting to make sure the field was weed free. He then testified as follows:
Q But all in all the field was pretty clean even before you plowed everything up?
A Yes, sir.
Q And even after you were done and you had gone through the plowing under, there was absolutely no traces of any weeds in there?
A That's right.
Q The seed beds were absolutely clean?
A Yes, sir.
Transcript at page 99. The evidence shows that the plaintiff knew what crop had been planted the previous year. He testified on page 48 of the transcript:
Q Now, on the land where you planted soybeans, do you know what was planted on that, the previous year?
A Corn.
The only reason Monsanto's expert gave as to why a farmer would need to know what herbicide had been used the prior year was that some herbicides have a long residual effect and can injure subsequent crops. There is no evidence of herbicide injury to appellee's soybean crop or the weeds.
Motion for rehearing denied.
LARRY G. SMITH and JOANOS, JJ., concur.