**In the Matter of BOB RIGBY, INC., Debtor.**

**BOB RIGBY, INC., Plaintiff,**

**v.**

**EAGLE CRUSHER, INC., Defendant.**

Bankruptcy No. 83–1520.
Adv. No. 83–784.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

July 8, 1986.

Nancy G. Farage, Tampa, Fla., Charles J. Cheves, Venice, Fla., for plaintiff/debtor.

John W. Foster, Orlando, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THE MATTER before the Court in this Chapter 11 case is an adversary proceeding which was initiated by a Complaint, filed by Bob Rigby, Inc. (Debtor) against Eagle Crusher Company, Inc. (Eagle), alleging breach of implied warranty, breach of express warranty, and negligent design of a portable rock crushing machine (machine).

In due course, Eagle filed its answer in which it generally denied all the allegations set forth in the Complaint relating to warranties, express and implied. In addition, it also set forth several affirmative defenses which are as follows: First, Eagle contended that the Debtor not only had ample opportunity to inspect the machine it purchased, but used the same prior to the acceptance and prior to its consent to finance the purchase price of the machine two months after actual delivery; second, that the Debtor failed to notify Eagle of any defect in the machine within a reasonable period of time; third, that the failure to function was the result of the Debtor's own failure to properly use, maintain, service or otherwise care for the machine; fourth, that the Debtor's damages, in any event, are speculative and not subject to proof; fifth, that the written warranty agreement which accompanied the machine is controlling and, under the terms of the "product warranty", granted by Eagle, the claims of the Debtor have been waived; and, sixth, that the Debtor is collaterally estopped from asserting any claims against Eagle because it suffered an adverse judgment in its suit against Linder Industrial Machinery Company (Linder), the distributor for Eagle who, in fact, sold the machine to the Debtor.

In due course, the matter was tried and the facts germane to the resolution of the issues raised by the respective contentions of the parties, as appear from the record, are as follows:

Since approximately 1966 Bob Rigby, operating as a sole proprietor, doing business as Bob Rigby Trucking, was engaged in mining and selling fill dirt and shell material, primarily to be used for road construction. During the summer of 1980, Rigby was in the process of forming Bob Rigby, Inc. to carry on the same business through the corporation. Rigby, as "promoter" of the corporation, began conferring with representatives of Eagle, a manufacturer of industrial machines and with representatives of Linder, the distributor of machines manufactured by Eagle. The discussions with the representatives of Eagle and Linder culminated in the execution of an agreement to purchase from Linder a rock crushing machine to be manufactured by Eagle. Bob Rigby, Inc. was actually formed on August 8, 1980 and it is without dispute that Bob Rigby subsequently ratified and assumed the agreement to purchase the machine which was originally entered into by Rigby individually (Plaintiff's Exh. # 2). It is equally without dispute that Linder clearly understood that it was dealing with a corporate purchaser and

not with Bob Rigby individually (Plaintiff's Exh. # 22). On August 26, 1980, Linder submitted a quotation to the Debtor which was accepted by Rigby as president of the Debtor on November 7, 1980. The quotation was also signed by Ben Scales, an employee of Linder, on behalf of Linder.

The evidence leaves no doubt that throughout the negotiations Rigby, Cox, an Eagle representative, and Scales extensively discussed the expected capacity of the machine and it was understood that Rigby expected that the machine should produce 300 tons per hour (TPH) of minus two-inch material. It is clear that Cox and Scales visited the airport site, one of the sites at which the Debtor was to operate the machine eventually; that the material stored at the site had been mined and stockpiled on the banks of the pit to permit the material to be air-dried.

There is ample evidence in this record to support the finding that Rigby was told from the beginning that if the machine was to reach the desired capacity, it would have to process relatively dry material. Although Cox, the Eagle representative, took handfuls of the dry, stockpiled material when he visited the airport site, Rigby was told that it was necessary to have a "run of mine," a sample which would have provided Eagle with an accurate specimen of the materials which would be handled by the machine, in order to assure that the machine was designed properly. The record reflects that no "run of mine" sample was ever provided to Eagle. There is conflicting evidence as to whose responsibility it was to provide a "run of mine" sample and it is in dispute the reason for the failure to provide it to Eagle.

Negotiations were ultimately concluded and Linder provided a final quotation describing the machine in some detail including the provision that the machine was to produce 300 TPH of minus two-inch product. On November 11, 1980, Rigby accepted the quotation submitted by Linder. On November 19, 1980, Linder forwarded a purchase order to Eagle. The purchase order contained the same product descrip-

tion and, in addition, also included a warranty which provided that Eagle warranted that the machine would produce a total of 300 TPH of minus two or three-inch product. (Defendant's Exh. # 30). Upon receipt of the purchase order, Eagle promptly advised Linder that the 300 TPH capacity could not be warranted because the production capability of the machine was dependent first on the size of the material it was to handle and second on its moisture content and some other factors. Eagle also stated that the capacity of the machine might be less under various conditions. Rigby was promptly advised by phone of Eagle's response. This communication was later confirmed in writing. (Defendant's Exh. # 31 and # 32). Linder wired a confirmation of its phone conversation with Eagle and advised Eagle to disregard the portion of the purchase order regarding the warranty by Eagle of the capacity stated in the original specification and in the purchase order. Linder acknowledged that it was to provide Eagle with sample material or a breakdown on particle size of material being fed into the machine before its estimated capacity and the ultimate product size could be determined. As noted, no "run of mine" was ever provided by the Debtor to Linder or by Linder to Eagle. It cannot seriously be questioned from the evidence presented that such information was requested of Rigby by Eagle on at least two occasions and that Rigby was advised that Eagle could not warrant 300 TPH unless it had an adequate sample of the material which was to be fed to the machine.

The record further reveals that, during the negotiations, Rigby consulted with Mr. Maloney, a representative of Empire Equipment Company (Empire), and ultimately leased a Hewitt Robbins rock crushing plant from Empire. Maloney advised Rigby that a rock crusher was a high maintenance item and that the hammerheads, an integral part of the rock crushing mechanism required almost daily welding. It further appears that Rigby was also advised of the hammerhead maintenance problem by Cox, the Eagle representative, and was

promised that an extra set would be shipped with the machine when it was delivered. There is no credible evidence in this record to substantiate Rigby's contention that Eagle represented to Rigby that the hammerhead of the machine would last at least six months.

On February 24, 1981, the machine manufactured by Eagle was delivered to Rigby's mining site known as the airport pit. Shortly thereafter, Phillips, a Linder employee, delivered the operating manual for the machine together with a product warranty. The warranty was a limited 90 day warranty covering only parts of the machine against defects. It specifically excluded defects if the machine had been "subjected to misuse, misapplication, neglect (including but not limited to improper maintenance and storage), accident, ... any and all modifications unless authorized by Eagle ... adjustment and repair...." The warranty further provided that all warranty claims must be submitted to Eagle within 30 days of the discovery of the defect within the warranty period. In addition, it also recited the following language:

THE FOREGOING OBLIGATIONS ARE IN LIEU OF ALL OTHER OBLIGATIONS AND LIABILITIES INCLUDING NEGLIGENCE AND ALL WARRANTIES, OF MERCHANTABILITY OR OTHERWISE, EXPRESSED OR IMPLIED, IN FACT OR BY LAW, AND STATE OUR ENTIRE AND EXCLUSIVE LIABILITY AND BUYER'S EXCLUSIVE REMEDY FOR ANY CLAIM OF DAMAGES IN CONNECTION WITH THE SALE OR FURNISHING OF GOODS OR PARTS, THEIR DESIGN, SUITABILITY FOR USE, INSTALLATION OR OPERATION.

After delivery of the machine, it was determined that the "grizzly" (grate) through which the raw materials were to be fed initially into the machine should be modified so that it would be inclined and not flat in order to permit usable materials to fall into the hopper and oversized materials to roll off. In order to accomplish this, the grizzly was removed from the machine and taken by Rigby to Brown's machine Shop located in Ft. Myers. It is without dispute that Eagle authorized the modification of the grizzly. However, in addition to the modification described earlier, the grizzly was further modified in the machine shop by enlarging the openings to permit larger materials to enter the hopper. The evidence is unclear as to who directed this additional modification. It is in dispute whether Eagle representatives objected to the modifications but it is clear that Eagle ultimately approved the modifications and paid the invoice submitted by Brown itemizing both modifications.

Upon completion of the modification, the machine was promptly set up for operation but immediately ran into difficulties. The testimony discloses that all understood that there will be some technical problems during the initial shakedown stage of the machine common to all newly manufactured and transported heavy equipment. The purchase order issued by Linder and sent to Eagle provided for a "field start-up service" pursuant to the terms of which an Eagle service representative would be provided for a period of three days or until the machine was performing to its specifications. In this case the start-up period lasted about one month, during which Eagle representatives and Linder representatives were frequently at the airport pit and, after March 6, 1981, at a second pit operated by the Debtor known as the Jones Loop Pit.

Near the end of March, 1981, Phillips, a representative of Linder, explained to Rigby that the machine would have to be accepted or rejected within a 30 day period and if accepted, the balance of the down payment must be paid and arrangements would have to be made to finance the balance of the purchase price. Rigby was also told that if he was not satisfied with the performance of the machine, he could reject the machine and his initial deposit of $16,504 would be returned. By the end of April, 1981 the machine was performing satisfactorily. On April 29, 1981, Rigby accepted the machine, paid the balance of

the down payment, and signed the financing papers with Allis-Chalmers who agreed to finance the balance of the purchase price.

On May 6, 1981, Eagle's president, Colby, visited the Jones Loop Pit and observed the machine in operation. On this occasion, he gave Rigby his business card and encouraged Rigby to call on him at any time if he had any problems with the machine.

The record reveals that no additional problems were experienced with the machine until after June 16, 1981. On that date, the machine was placed near an embankment of the pit from which materials were being taken when the ground gave way and the machine tumbled down the embankment, toppled over and sustained substantial damage. Rigby failed to notify Eagle of the accident and instructed his employees to make the repairs themselves. Although Rigby continued to use the machine until December of 1981, the record reflects that the machine never functioned satisfactorily after the accident.

Prior to the accident, the machine functioned substantially in accordance with its specifications when used to process dry material of the type stockpiled and air-dried at the airport pit which was the originally intended location of the machine's use, and the site of the mining operation indicated by Rigby at the initial meetings.

There is no question that the material fed into the machine at the Jones Loop Pit was not dry stockpiled materials but was material scooped by dragline from the Pit and placed directly into the machine. For this reason, the material fed into the machine was moist and high in clay content and both of those characteristics substantially reduced the production capacity of the machine and caused inordinant and unusually frequent maintenance problems. There is no evidence of any complaints by Rigby concerning the operation of the machine from the period of Rigby's acceptance of the machine in late April, 1981 up to December of 1981 at which time Rigby stopped using the machine.

On February 14, 1982, almost one year after delivery of the machine to the airport pit, Rigby notified Linder that the machine failed to perform as represented by Eagle and Linder. (Plaintiff's Exh. # 5).

In September of 1982, after a substantial period of default by the Debtor in its financing contract, Allis-Chalmers repossessed the machine pursuant to the terms of the security agreement executed by the Debtor in connection with the purchase of the machine. In 1982, the Debtor filed suit in the Circuit Court for Sarasota County, Florida against Linder and Eagle seeking money damages on several theories including the theories of express and implied warranties. On the eve of trial, the Debtor took a voluntary non-suit on its claim against Eagle and the trial proceeded only on the claims against Linder. The case was submitted to the jury after full scale trial on the express and implied warranty claims and the jury returned a verdict in favor of Linder and the Debtor's complaint against Linder was dismissed with prejudice. On July 21, 1983, the Debtor filed its Chapter 11 case and shortly thereafter filed this adversary proceeding against Eagle.

These are the facts against which the three claims asserted by the Debtor, i.e. breach of express warranty, breach of implied warranty, and negligent design, must be tested.

It should be stated at the outset that the law is clear that before the Debtor can recover on any of the three theories advanced in support of its claim for recovery, the burden is on the Debtor to establish with clear and convincing evidence that the facts developed in this record, in fact, support the claim asserted on these various theories. Considering these claims ad seriatim, this Court is satisfied that the claim of the Debtor based on breach of an express warranty by Eagle has not been established with the requisite degree of proof and must be rejected for the following reasons:

■ First, the transaction under consideration is governed by Article 2 of the

Uniform Commercial Code as adopted by Fla. Stat. § 672.101 et seq., the Statute which governs the sale of goods in this State. Second, while Eagle was not the actual seller of the machine, this is without significance. Fla. Stat. § 672.313 does not limit express warranty to the actual seller in spite of the fact that a literal reading of the Section might so indicate, but also extends the same to the manufacturer of the goods if, in fact, an express warranty arose by virtue of other means described in the Statute. *Mobile Chemical Company v. Hawkins*, 440 So.2d 378, *pet. for rev. den.*, 449 So.2d 264 (Fla. 1984); *Monsanto Agricultural Products Company v. Edenfield*, 426 So.2d 574 (Fla. 1st DCA 1982); *Sheppard v. Revlon, Inc.*, 267 So.2d 662 (Fla. 3d DCA 1972).

This leads to the ultimate issue to be resolved which is the viability of the Debtor's claim set forth in Count I of the Complaint which is that there was an express warranty running from Eagle to the Debtor and that the same was breached. The express warranty asserted by the Debtor relates to the capacity of the machine to produce 300 TPH of a specific size end-product, and to an alleged warranty as to the useful life of the hammerheads, an essential part of the machine.

■ It should be stated at the outset that it is evident from this record that while the Debtor intended to purchase a machine capable of processing mined material suitable to be used in road construction and stated its desire to Linder to purchase a machine with a capability of producing 300 TPH of specific size end-product, it is equally without doubt that Eagle made it clear that without the benefit of a "run of mine" sample material, it would not be able to guarantee a specific rate of production. There is no doubt that this was expressly communicated to the Debtor at least twice, long before the Debtor actually purchased the machine.

■ Neither would this record justify the finding that Eagle warranted any specific useful life of the hammerheads. On the contrary, the record is clear that the Debtor knew that the machine was a high maintenance item and the hammerheads had a relatively short lifespan. Even if there was a statement made by a representative of Eagle that the hammerheads would have a useful life without maintenance of at least six months or more, Rigby was not entitled to rely on any such statement in light of the uncontradicted fact that he was told by Mr. Maloney of Empire that the hammerheads had a relatively short lifespan and that they are a high maintenance item. The requirement that a statement be a basis of the bargain is essentially a reliance requirement and is a significant factor in the determination as to whether specific language consitutued an express warranty. The absence of reliance will negate the existence of an express warranty. *Royal Typewriter Company, a division of Litton Business Systems, Inc. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1101 (11th Cir.1983), construing Fla. Stat. § 672.313(1)(a).

Even if Rigby had met its burden of establishing an express warranty, it would have had to give proper notice to Eagle of a breach of warranty in order to recover. The Statute governing the requirement to give notice reads as follows:

Fla. Stat. § 672.607 Effect of acceptance; notice of breach; burden of establishing breach after acceptance; notice of claim or litigation to person answerable over

(2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this chapter for non-conformity.

(3) Where a tender has been accepted:

(a) The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.

(4) The burden is on the buyer to establish any breach with respect to the goods accepted.

■ It is contended by the Debtor that it was led to believe that the non-conformity of the machine would be cured; therefore, it was not required to notify Eagle that the machine failed to produce at the rate required by the Debtor, relying on Fla. Stat. § 672.607(2). The only act which would have been considered to be a revocation of the acceptance was a rejection letter which was not sent by Rigby to Linder until February 12, 1982, or almost one year after delivery of the machine. This certainly cannot be accepted as reasonable notice which would meet the requirement of the Statute.

■ There is an additional reason why the Debtor cannot recover on its claim of express warranty. It is without dispute and is clear from this record that in April of 1981, prior to the actual purchase of the machine, the Debtor was offered an option either to refuse to purchase the machine, return the same and recover all monies paid as part of the down payment and cancel the entire transaction, or proceed and complete the transaction and purchase the machine. The Debtor elected to accept the machine, paid the balance of the down payment and entered into a financing arrangement with Allis-Chalmers for the purpose of financing the balance of the purchase price. It is evident that once a buyer of goods is given an opportunity to rescind the transaction after the discovery of any defects in the machine and fails to do so, it ill behooves the buyer to complain later that the machine was not performing as it was warranted by the seller of the goods or, in this case the manufacturer, or that it is not fit for the purpose of the intended use.

Based on the foregoing, there is no doubt that, first, there was no express warranty running from Eagle to the Debtor, thus, none could be breached; and, second, even if there was one, the Debtor never effectively revoked its acceptance of the machine and, therefore, cannot recover on the breach of an express warranty.

■ The claim asserted in Count II by the Debtor is based on a breach of an implied warranty of merchantability and of fitness of the machine for a particular purpose. The Debtor contends that the machine in question was not merchantable because it failed to produce finished product at the rate of 300 TPH as quoted. To be merchantable, the goods must be fit for the ordinary purpose for which such goods are used. Fla. Stat. § 672.314; *Pennington Grain and Seed, Inc. v. Tuten*, 422 So.2d 948 (Fla. 1st DCA 1982). The Statute in question basically deals with two concepts; it deals with merchantability of goods sold and the concept of implied warranty of fitness for the intended purpose. It is unclear whether the legislature intended to use these two concepts interchangeably. The Statute defines the concept of merchantability in the following manner:

Fla. Stat. § 672.314

(2) Goods to be merchantable must be at least such as:

(a) Pass without objection in the trade under the contract description; and

(c) Are fit for the ordinary purpose for which such goods are used; and....

The crucial words in this definition are contained in the phrase which requires that the goods must be fit for an *ordinary purpose*. To translate this requirement to the facts in this case, this Court is satisfied that this machine was fit for the ordinary purpose for which these machines are generally used, that is, to crush raw, solid material, to wit rocks, and reduce them to a specific size. Thus, even assuming, and there is authority for the proposition, *Rehurek v. Chrysler Credit Corp.*, 262 So.2d 452 (Fla. 2d DCA 1972), that this type of warranty runs to the manufacturer even though there was no privity between the manufacturer and the ultimate purchaser of the machine, i.e. between Eagle and the Debtor, the machine was certainly fit for the ordinary purpose for which it was intended.

As noted above, the machine was designed to process dry, free-flowing material such as that stockpiled at the airport pit. It is uncontested that the materials actually fed to the machine were of a high moisture and clay content. The fact that the machine did not function as well when used in a manner other than that for which it was designed does not support the Debtor's action for breach of merchantability. *Crawford v. Gold Kist, Inc.*, 614 F.Supp. 682 (M.D. Fla. 1985).

Rigby also contends that failure of the machine to produce satisfactorily constitutes a breach of an implied warranty for fitness for a particular purpose. An implied warranty of fitness for a particular purpose arises when the seller knows of the particular purpose for which a particular item was required and knows that the buyer is relying on the seller's skill or judgment to select or furnish the item suitable for that purpose. Fla. Stat. § 672.315. There is no doubt that, under Florida law, a manufacturer as well as a seller can be held liable on an implied warranty when the manufacturer's agent has dealt directly with the ultimate buyer, as in this case. *Cedars of Lebanon Hosp. Corp. v. European X-Ray Distributors of America, Inc.*, 444 So.2d 1068 (Fla. 3d DCA 1984). It is clear that the machine delivered to Rigby by Eagle was not designed for the use in which it was actually employed. There is absolutely no evidence in this record that Eagle knew how the machine would ultimately be used, although it knew the purpose of its initially intended use. As noted above, Cox was taken to the airport pit and was shown dry, free-flowing stockpiled materials during the negotiations. Eagle was never informed that the machine would be taken to a completely different site and fed materials high in moisture and clay content. Moreover, the "run of mine" sample Eagle required in order to determine the particular purpose for which the machine was required was never provided, although the record is clear that Rigby was aware that the sample was necessary in order for Eagle to determine the capacity of the machine.

Based on the foregoing, this Court is satisfied that the implied warranty of merchantability was not breached and the implied warranty of fitness for a particular purpose never came into existence. Moreover, even if an implied warranty of fitness for a particular purpose had arisen, Rigby is barred from any remedy for that breach because of its failure to notify Eagle within a reasonable time of its claim of breach on the ground that the machinery did not conform with the specifications for use provided to the manufacturer. As noted earlier, after accepting the machinery in April, 1981, Rigby continued to use the machine and did not pursue any breach of warranty claim until the letter sent to Linder by Rigby's attorney almost one year after delivery, raising the spector of breach for the first time. This cannot be accepted as notice within a reasonable time within the meaning of Fla. Stat. § 672.2–607(2).

This leaves for consideration the Defendant's claim that the machine was negligently designed by Eagle in that Eagle was aware that the design requirements were dependent on analysis of a "run of mine" sample and, therefore, Eagle owed a duty to the Debtor to obtain samples and analyze them before designing and manufacturing the machine. This duty was breached, so contends Rigby, by its failure to conduct a "run of mine" analysis before manufacture. The "run of mine" sample, according to Rigby, would have disclosed that the machine ultimately manufactured and sold to the Debtor was not suited for the use intended. In support of this contention, the Debtor relies on a memo from Ray Lynn, an Eagle troubleshooter, sent to Eagle in which Lynn recommended that "before any order is accepted, it must be cleared by a factory representative in regard to production (TPH), type of material, material gradation, silica content, moisture and stickiness of material." (Plaintiff's Exh. # 3). Eagle contends that an action will not lie based on negligence when, as must be conceded here, there is no claim for personal injury or injury to property

but merely a claim which is limited to economic and pecuniary damages.

The claim based on negligence was presented earlier in this case by a Motion for Summary Judgment filed by Eagle. In considering Eagle's Motion, this Court, relying on *Monsanto Agricultural Products Co. v. Edenfield,* 426 So.2d 574 (Fla. 1st DCA 1982), held that in Florida a cause of action would not lie for the negligent manufacture of goods where the resulting loss is only economic as distinguished from injury to persons or property.

On a Motion for Rehearing filed by the Debtor, this Court reconsidered its Order on Motion for Summary Judgment in light of the Florida Supreme Court decision in *First American Title Insurance Co. v. First Title Service Co. of the Florida Keyes, Inc.,* 457 So.2d 467 (Fla. 1984). In that case, the Supreme Court held that an abstract company, with knowledge that the buyer of real property would rely on the abstract, would be liable to the buyer for negligent preparation of the abstract furnished to the seller even though the buyer's loss was only economic. Based on the *First American* decision, this Court reversed its ruling and denied Eagle' Motion for Summary Judgment on March 4, 1985.

Before revisiting this issue, it should be noted that just prior to the Florida Supreme Court's decision in *First American,* the Supreme Court had the opportunity to review the Third DCA's decision in *GAF Corp. v. The Zack Co.* which followed the Florida line of cases holding that no tort remedy existed to permit recovery of purely economical losses, but chose to deny the petition for review. *GAF Corp. v. The Zack Co.,* 445 So.2d 350 (Fla. 3d DCA 1984), *pet. for rev. den.,* 453 So.2d 45 (Fla. 1984). The *GAF Corp.* case involved the sale of goods, a transaction clearly within Article 2 of the UCC, a transaction identical to the transaction involved in the instant case and distinguishable from the *First American* case which dealt with negligence in performing a professional service and not sale of goods. In *GAF Corp.,* the Third DCA held that the contractor had no cause of action in negligence against the manufacturer of roofing material when no one was personally injured and no property damage was sustained by reason of the defective materials. The Court held that a negligence action could not lie because no cognizable tort damages were sustained by the Plaintiff, *citing* W. Prosser, *LAW OF TORTS,* § 30 at 143 (4th ed. 1971). As noted, the Supreme Court refused to disturb the holding of the Third DCA. While a denial of a petition for certiorari is not legally an affirmance, the distinction between the facts in *GAF* and *First American,* the sale of goods in *GAF* and the sale of services in *First American,* is persuasive.

More important is the case of *L.C. Crawford v. Gold Kist, Inc.,* 614 F. Supp. 682 (M.D. Fla.1985), where the district court, construing Florida law, held that a seed dealer's duty to furnish a buyer with an economically effective product, as opposed to a safe one, could arise only when expressly agreed to by the parties or when implied by law. The duty, if there was one, must arise under the law of contract, not based on tort law.

■ There is nothing in this record to substantiate the finding that Eagle contractually assumed the duty to design a machine that would produce material at the rate of 300 TPH under any and all conditions, regardless of the type of raw material Rigby chose to feed into the machine. Having found no duty to exist, there can be no breach which would support a claim based on negligence.

Based on the foregoing, this Court is satisfied that the Debtor is not entitled to the relief it seeks on any of the theories asserted in Counts I, II and III of its Complaint.

A separate final judgment will be entered in accordance with the foregoing.