**STEP–SAVER DATA SYSTEMS, INC., Appellant,**

v.

**WYSE TECHNOLOGY and the Software Link, Inc.**

**No. 90–1859.**

United States Court of Appeals, Third Circuit.

Argued April 8, 1991.

Decided July 29, 1991.

Francis X. Clark (argued), John H. Kiefel, Ronald H. Silverman, Silverman, Clark & Van Galen, King of Prussia, Pa., for appellant.

Jay P. Hendrickson (argued), Hendrickson, Higbie & Cole, San Francisco, Cal., Joseph Schumacher, Abraham, Pressman & Bauer, Philadelphia, Pa., for appellee, Wyse Technology.

Debra G. Buster (argued), Stephen M. Dorvee, Arnall, Golden & Gregory, Atlanta, Ga., Frederick C. Fletcher, II, Swartz, Campbell & Detweiler, Philadelphia, Pa., for appellee, The Software Link, Inc.

Before SLOVITER, Chief Judge, and COWEN and WISDOM,* Circuit Judges.

## OPINION OF THE COURT

WISDOM, Circuit Judge:

The "Limited Use License Agreement" printed on a package containing a copy of a computer program raises the central issue in this appeal. The trial judge held that the terms of the Limited Use License Agreement governed the purchase of the package, and, therefore, granted the software producer, The Software Link, Inc. ("TSL"), a directed verdict on claims of breach of warranty brought by a disgruntled purchaser, Step–Saver Data Systems, Inc. We disagree with the district court's determination of the legal effect of the license, and reverse and remand the warranty claims for further consideration.

Step–Saver raises several other issues, but we do not find these issues warrant reversal. We, therefore, affirm in all other respects.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The growth in the variety of computer hardware and software has created a strong market for these products. It has also created a difficult choice for consumers, as they must somehow decide which of the many available products will best suit their needs. To assist consumers in this decision process, some companies will evaluate the needs of particular groups of potential computer users, compare those needs with the available technology, and develop a package of hardware and software to satisfy those needs. Beginning in 1981, Step–Saver performed this function as a value added retailer for International Business Machine (IBM) products. It would combine hardware and software to satisfy the word processing, data management, and communications needs for offices of physicians and lawyers. It originally marketed single computer systems, based primarily on the IBM personal computer.

As a result of advances in micro-computer technology, Step–Saver developed and marketed a multi-user system. With a multi-user system, only one computer is required. Terminals are attached, by cable, to the main computer. From these

* Hon. John M. Wisdom, United States Court of Appeals for the Fifth Circuit, sitting by designation.

terminals, a user can access the programs available on the main computer.[1]

After evaluating the available technology, Step–Saver selected a program by TSL, entitled Multilink Advanced, as the operating system for the multi-user system. Step–Saver selected WY–60 terminals manufactured by Wyse, and used an IBM AT as the main computer. For applications software, Step–Saver included in the package several off-the-shelf programs, designed to run under Microsoft's Disk Operating System ("MS–DOS"),[2] as well as several programs written by Step–Saver. Step–Saver began marketing the system in November of 1986, and sold one hundred forty-two systems mostly to law and medical offices before terminating sales of the system in March of 1987. Almost immediately upon installation of the system, Step–Saver began to receive complaints from some of its customers.[3]

Step–Saver, in addition to conducting its own investigation of the problems, referred these complaints to Wyse and TSL, and requested technical assistance in resolving the problems. After several preliminary attempts to address the problems, the three companies were unable to reach a satisfactory solution, and disputes developed among the three concerning responsibility for the problems. As a result, the problems were never solved. At least twelve of Step–Saver's customers filed suit against Step–Saver because of the problems with the multi-user system.

Once it became apparent that the three companies would not be able to resolve their dispute amicably, Step–Saver filed suit for declaratory judgment, seeking indemnity from either Wyse or TSL, or both, for any costs incurred by Step–Saver in defending and resolving the customers' law suits. The district court dismissed this complaint, finding that the issue was not ripe for judicial resolution. We affirmed the dismissal on appeal.[4] Step–Saver then filed a second complaint alleging breach of warranties by both TSL and Wyse and intentional misrepresentations by TSL.[5] The district court's actions during the resolution of this second complaint provide the foundation for this appeal.

On the first day of trial, the district court specifically agreed with the basic contention of TSL that the form language printed on each package containing the Multilink Advanced program ("the box-top license") was the complete and exclusive agreement between Step–Saver and TSL under § 2–202 of the Uniform Commercial Code (UCC).[6] Based on § 2–316 of the UCC, the

1. In essence, the terminals are simply video screens with keyboards that serve as input-output devices for the main computer. The main computer receives data from all of the terminals and processes it appropriately, sending a return signal to the terminal. To someone working on one of the terminals of a properly operating multi-user system, the terminal appears to function as if it were, in fact, a computer. Thus, an operator could work with a word processing program on a terminal, and it would appear to the operator the same as would working with the word processing program on a computer. The difference is that, with a set of computers, the commands of each user are processed within each user's computer, whereas with a multi-user system, the commands of all of the users are sent to the main computer for processing.

2. MS–DOS was the standard operating system for IBM and compatible personal computers.

3. According to the testimony of Jeffrey Worthington, an employee of Step–Saver, twenty to twenty-five of the purchasers of the multi-user system had serious problems with the system that were never resolved.

4. See Step–Saver Data Sys., Inc. v. Wyse Tech., 912 F.2d 643 (3d Cir.1990).

5. Step–Saver also advanced claims under negligent misrepresentation and breach of contract theories. Step–Saver does not appeal these claims.

6. All three parties agree that the terminals and the program are "goods" within the meaning of UCC § 2–102 & 2–105. Cf. Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 674–76 (3d Cir.1991). TSL and Step–Saver have disputed whether Pennsylvania or Georgia law governs the issues of contract formation and modification with regard to the Multilink programs. Because both Pennsylvania and Georgia have adopted, without modification, the relevant portions of Article 2 of the Uniform Commercial Code, see Ga.Code Ann. §§ 11–2–101 to 11–2–725 (1990); 13 Pa.Cons.Stat.Ann. §§ 2101–2725 (Purdon 1984), we will simply cite to the relevant UCC provision.

district court held that the box-top license disclaimed all express and implied warranties otherwise made by TSL. The court therefore granted TSL's motion in limine to exclude all evidence of the earlier oral and written express warranties allegedly made by TSL. After Step–Saver presented its case, the district court granted a directed verdict in favor of TSL on the intentional misrepresentation claim, holding the evidence insufficient as a matter of law to establish two of the five elements of a prima facie case: (1) fraudulent intent on the part of TSL in making the representations; and (2) reasonable reliance by Step–Saver. The trial judge requested briefing on several issues related to Step–Saver's remaining express warranty claim against TSL. While TSL and Step–Saver prepared briefs on these issues, the trial court permitted Wyse to proceed with its defense. On the third day of Wyse's defense, the trial judge, after considering the additional briefing by Step–Saver and TSL, directed a verdict in favor of TSL on Step–Saver's remaining warranty claims, and dismissed TSL from the case.

The trial proceeded on Step–Saver's breach of warranties claims against Wyse. At the conclusion of Wyse's evidence, the district judge denied Step–Saver's request for rebuttal testimony on the issue of the ordinary uses of the WY–60 terminal. The district court instructed the jury on the issues of express warranty and implied warranty of fitness for a particular purpose. Over Step–Saver's objection, the district court found insufficient evidence to support a finding that Wyse had breached its implied warranty of merchantability, and refused to instruct the jury on such warranty. The jury returned a verdict in favor of Wyse on the two warranty issues submitted.

Step–Saver appeals on four points. (1) Step–Saver and TSL did not intend the box-top license to be a complete and final expression of the terms of their agreement. (2) There was sufficient evidence to support each element of Step–Saver's contention that TSL was guilty of intentional misrepresentation. (3) There was sufficient evidence to submit Step–Saver's implied warranty of merchantability claim against Wyse to the jury. (4) The trial court abused its discretion by excluding from the evidence a letter addressed to Step–Saver from Wyse, and by refusing to permit Step–Saver to introduce rebuttal testimony on the ordinary uses of the WY–60 terminal.

## II. THE EFFECT OF THE BOX–TOP LICENSE

The relationship between Step–Saver and TSL began in the fall of 1984 when Step–Saver asked TSL for information on an early version of the Multilink program. TSL provided Step–Saver with a copy of the early program, known simply as Multilink, without charge to permit Step–Saver to test the program to see what it could accomplish. Step–Saver performed some tests with the early program, but did not market a system based on it.

In the summer of 1985, Step–Saver noticed some advertisements in Byte magazine for a more powerful version of the Multilink program, known as Multilink Advanced. Step–Saver requested information from TSL concerning this new version of the program, and allegedly was assured by sales representatives that the new version was compatible with ninety percent of the programs available "off-the-shelf" for computers using MS–DOS. The sales representatives allegedly made a number of additional specific representations of fact concerning the capabilities of the Multilink Advanced program.

Based on these representations, Step–Saver obtained several copies of the Multilink Advanced program in the spring of 1986, and conducted tests with the program. After these tests, Step–Saver decided to market a multi-user system which used the Multilink Advanced program. From August of 1986 through March of 1987, Step–Saver purchased and resold 142 copies of the Multilink Advanced program. Step–Saver would typically purchase copies of the program in the following manner. First, Step–Saver would telephone TSL and place an order. (Step–Saver would typical-

ly order twenty copies of the program at a time.) TSL would accept the order and promise, while on the telephone, to ship the goods promptly. After the telephone order, Step–Saver would send a purchase order, detailing the items to be purchased, their price, and shipping and payment terms. TSL would ship the order promptly, along with an invoice. The invoice would contain terms essentially identical with those on Step–Saver's purchase order: price, quantity, and shipping and payment terms. No reference was made during the telephone calls, or on either the purchase orders or the invoices with regard to a disclaimer of any warranties.

Printed on the package of each copy of the program, however, would be a copy of the box-top license. The box-top license contains five terms relevant to this action:

(1) The box-top license provides that the customer has not purchased the software itself, but has merely obtained a personal, non-transferable license to use the program.[7]

(2) The box-top license, in detail and at some length, disclaims all express and implied warranties except for a warranty that the disks contained in the box are free from defects.

(3) The box-top license provides that the sole remedy available to a purchaser of the program is to return a defective disk for replacement; the license excludes any liability for damages, direct or consequential, caused by the use of the program.

7. When these form licenses were first developed for software, it was, in large part, to avoid the federal copyright law first sale doctrine. Under the first sale doctrine, once the copyright holder has sold a copy of the copyrighted work, the owner of the copy could "sell or otherwise dispose of the possession of that copy" without the copyright holder's consent. *See Bobbs–Merrill Co. v. Straus,* 210 U.S. 339, 350, 28 S.Ct. 722, 726, 52 L.Ed. 1086 (1908); 17 U.S.C.A. § 109(a) (West 1977). Under this doctrine, one could purchase a copy of a computer program, and then lease it or lend it to another without infringing the copyright on the program. Because of the ease of copying software, software producers were justifiably concerned that companies would spring up that would purchase copies of various programs and then lease those to consumers. Typically, the companies, like a videotape rental store, would purchase a number of copies of each program, and then make them available for over-night rental to consumers. Consumers, instead of purchasing their own copy of the program, would simply rent a copy of the program, and duplicate it. This copying by the individual consumers would presumably infringe the copyright, but usually it would be far too expensive for the copyright holder to identify and sue each individual copier. Thus, software producers wanted to sue the companies that were renting the copies of the program to individual consumers, rather than the individual consumers. The first sale doctrine, though, stood as a substantial barrier to successful suit against these software rental companies, even under a theory of contributory infringement. By characterizing the original transaction between the software producer and the software rental company as a license, rather than a sale, and by making the license personal and non-transferable, software producers hoped to avoid the reach of the first sale doctrine and

to establish a basis in state contract law for suing the software rental companies directly. Questions remained, however, as to whether the use of state contract law to avoid the first sale doctrine would be preempted either by the federal copyright statute (statutory preemption) or by the exclusive constitutional grant of authority over copyright issues to the federal government (constitutional preemption). *See generally Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989); *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). Congress recognized the problem, and, in 1990, amended the first sale doctrine as it applies to computer programs and phonorecords. *See* Computer Software Rental Amendments Act of 1990, Pub.L. No. 101–650, 104 Stat. 5134 (codified at 17 U.S.C.A. § 109(b) (West Supp.1991)). As amended, the first sale doctrines permits only non-profit libraries and educational institutions to lend or lease copies of software and phonorecords. *See* 17 U.S.C.A. § 109(b)(1)(A) (West Supp.1991). (Under the amended statute, a purchaser of a copy of a copyrighted computer program may still sell his copy to another without the consent of the copyright holder.) This amendment renders the need to characterize the original transaction as a license largely anachronistic. While these transactions took place in 1986–87, before the Computer Software Rental Amendments were enacted, there was no need to characterize the transactions between Step–Saver and TSL as a license to avoid the first sale doctrine because both Step–Saver and TSL agree that Step–Saver had the right to resell the copies of the Multilink Advanced program.

(4) The box-top license contains an integration clause, which provides that the box-top license is the final and complete expression of the terms of the parties's agreement.

(5) The box-top license states: "Opening this package indicates your acceptance of these terms and conditions. If you do not agree with them, you should promptly return the package unopened to the person from whom you purchased it within fifteen days from date of purchase and your money will be refunded to you by that person."

The district court, without much discussion, held, as a matter of law, that the box-top license was the final and complete expression of the terms of the parties's agreement. Because the district court decided the questions of contract formation and interpretation as issues of law, we review the district court's resolution of these questions *de novo*.[8]

**8.** *See Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1442 (9th Cir.1986).

**9.** *See* UCC § 2–206(1)(b) and comment 2. Note that under UCC § 2–201, the oral contract would not be enforceable in the absence of a writing or part performance because each order typically involved more than $500 in goods. However, courts have typically treated the questions of formation and interpretation as separate from the question of when the contract becomes enforceable. *See, e.g., C. Itoh & Co. v. Jordan Int'l Co.*, 552 F.2d 1228, 1232–33 (7th Cir.1977); *Southeastern Adhesives Co. v. Funder America*, 89 N.C.App. 438, 366 S.E.2d 505, 507–08 (N.C.Ct.App.1988); *United Coal & Commodities Co. v. Hawley Fuel Coal, Inc.*, 363 Pa.Super. 106, 525 A.2d 741, 743 (Pa.Super.Ct.), *app. denied*, 517 Pa. 609, 536 A.2d 1333 (1987).

**10.** Section 2–207 provides:
Additional Terms in Acceptance or Confirmation.
(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

Step–Saver contends that the contract for each copy of the program was formed when TSL agreed, on the telephone, to ship the copy at the agreed price.[9] The box-top license, argues Step–Saver, was a material alteration to the parties's contract which did not become a part of the contract under UCC § 2–207.[10] Alternatively, Step–Saver argues that the undisputed evidence establishes that the parties did not intend the box-top license as a final and complete expression of the terms of their agreement, and, therefore, the parol evidence rule of UCC § 2–202 would not apply.[11]

TSL argues that the contract between TSL and Step–Saver did not come into existence until Step–Saver received the program, saw the terms of the license, and opened the program packaging. TSL contends that too many material terms were omitted from the telephone discussion for that discussion to establish a contract for the software. Second, TSL contends that its acceptance of Step–Saver's telephone offer was conditioned on Step–Saver's ac-

(a) the offer expressly limits acceptance to the terms of the offer;
(b) they materially alter it; or
(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of the Act.

**11.** Two other issues were raised by Step–Saver. First, Step–Saver argued that the box-top disclaimer is either unconscionable or not in good faith. Second, Step–Saver argued that the warranty disclaimer was inconsistent with the express warranties made by TSL in the product specifications. Step–Saver argues that interpreting the form language of the license agreement to override the specific warranties contained in the product specification is unreasonable, citing *Consolidated Data Terminals v. Applied Digital Data Sys.*, 708 F.2d 385 (9th Cir.1983). *See also Northern States Power Co. v. ITT Meyer Indus.*, 777 F.2d 405 (8th Cir.1985). Because of our holding that the terms of the box-top license were not incorporated into the contract, we do not address these issues.

ceptance of the terms of the box-top license. Therefore, TSL argues, it did not accept Step–Saver's telephone offer, but made a counteroffer represented by the terms of the box-top license, which was accepted when Step–Saver opened each package. Third, TSL argues that, however the contract was formed, Step–Saver was aware of the warranty disclaimer, and that Step–Saver, by continuing to order and accept the product with knowledge of the disclaimer, assented to the disclaimer.

In analyzing these competing arguments, we first consider whether the license should be treated as an integrated writing under UCC § 2–202, as a proposed modification under UCC § 2–209, or as a written confirmation under UCC § 2–207. Finding that UCC § 2–207 best governs our resolution of the effect of the box-top license, we then consider whether, under UCC § 2–207, the terms of the box-top license were incorporated into the parties's agreement.

### A. Does UCC § 2–207 Govern the Analysis?

 As a basic principle, we agree with Step–Saver that UCC § 2–207 governs our analysis. We see no need to parse the parties's various actions to decide exactly when the parties formed a contract. TSL has shipped the product, and Step–Saver has accepted and paid for each copy of the program. The parties's performance demonstrates the existence of a contract. The dispute is, therefore, not over the existence of a contract, but the nature of its terms.[12] When the parties's conduct establishes a contract, but the parties have failed to adopt expressly a particular writing as the terms of their agreement, and the writings exchanged by the parties do not agree, UCC § 2–207 determines the terms of the contract.

As stated by the official comment to § 2–207:

1. This section is intended to deal with two typical situations. The one is the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or more of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed. . . .

2. Under this Article a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained in the confirmation or in the acceptance falls within subsection (2) and must be regarded as a proposal for an added term unless the acceptance is made conditional on the acceptance of the additional or different terms.

Although UCC § 2–202 permits the parties to reduce an oral agreement to writing, and UCC § 2–209 permits the parties to modify an existing contract without additional consideration, a writing will be a final expression of, or a binding modification to, an earlier agreement only if the parties so intend.[13] It is undisputed that Step–Saver never expressly agreed to the terms of the box-top license, either as a final expression of, or a modification to, the parties's agreement. In fact, Barry Greebel, the President of Step–Saver, testified without dispute that he objected to the terms of the box-top license as applied to Step–Saver. In the absence of evidence demonstrating an express intent to adopt a writing as a final expression of, or a modification to, an earlier agreement, we find UCC § 2–207 to provide the appropriate legal rules for determining whether such an intent can be inferred from continuing with the contract after receiving a writing containing additional or different terms.[14]

To understand why the terms of the license should be considered under § 2–207

**12.** *See McJunkin Corp. v. Mechanicals, Inc.,* 888 F.2d 481, 488 (6th Cir.1989).

**13.** *See, e.g., Sierra Diesel Injection Serv., Inc. v. Burroughs Corp.,* 890 F.2d 108, 112–13 (9th Cir. 1989) (UCC § 2–202). By its terms, UCC

§ 2–209 extends only to "[a]n agreement to modify".

**14.** *See Mead Corp. v. McNally–Pittsburgh Mfg. Corp.,* 654 F.2d 1197, 1206 (6th Cir.1981).

in this case, we review briefly the reasons behind § 2–207. Under the common law of sales, and to some extent still for contracts outside the UCC,[15] an acceptance that varied any term of the offer operated as a rejection of the offer, and simultaneously made a counteroffer.[16] This common law formality was known as the mirror image rule, because the terms of the acceptance had to mirror the terms of the offer to be effective.[17] If the offeror proceeded with the contract despite the differing terms of the supposed acceptance, he would, by his performance, constructively accept the terms of the "counteroffer", and be bound by its terms. As a result of these rules, the terms of the party who sent the last form, typically the seller, would become the terms of the parties's contract. This result was known as the "last shot rule".

The UCC, in § 2–207, rejected this approach. Instead, it recognized that, while a party may desire the terms detailed in its form if a dispute, in fact, arises, most parties do not expect a dispute to arise when they first enter into a contract. As a result, most parties will proceed with the transaction even if they know that the terms of their form would not be enforced.[18] The insight behind the rejection of the last shot rule is that it would be unfair to bind the buyer of goods to the standard terms of the seller, when neither party cared sufficiently to establish expressly the terms of their agreement, simply because the seller sent the last form. Thus, UCC § 2–207 establishes a legal rule that proceeding with a contract after receiving a writing that purports to define the terms of the parties's contract is not sufficient to establish the party's consent to the terms of the writing to the extent that the terms of the writing either add to, or differ from, the terms detailed in the parties's earlier writings or discussions.[19] In the absence of a party's express assent to the additional or different terms of the writing, section 2–207 provides a default rule that the parties intended, as the terms of their agreement, those terms to which both parties have agreed,[20] along with any terms implied by the provisions of the UCC.

The reasons that led to the rejection of the last shot rule, and the adoption of section 2–207, apply fully in this case. TSL never mentioned during the parties's negotiations leading to the purchase of the programs, nor did it, at any time, obtain Step–Saver's express assent to, the terms of the box-top license. Instead, TSL contented itself with attaching the terms to the packaging of the software, even though those terms differed substantially from those previously discussed by the parties. Thus, the box-top license, in this case, is best seen as one more form in a battle of forms, and the question of whether Step–Saver has agreed to be bound by the terms of the box-top license is best resolved by applying

**15.** *See, e.g., Learning Works, Inc. v. Learning Annex, Inc.,* 830 F.2d 541, 543 (4th Cir.1987).

**16.** *See, e.g., Diamond Fruit Growers, Inc.,* 794 F.2d at 1443; J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 1–2 at 34 (2d ed. 1980).

**17.** *See, e.g., Daitom, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1578 (10th Cir.1984).

**18.** As Judge Engel has written:
Usually, these standard terms mean little, for a contract looks to its fulfillment and rarely anticipates its breach. Hope springs eternal in the commercial world and expectations are usually, but not always, realized.
*McJunkin Corp. v. Mechanicals, Inc.,* 888 F.2d at 482.

**19.** As the *Mead* Court explained:

Absent the [UCC], questions of contract formation and intent remain factual issues to be resolved by the trier of fact after careful review of the evidence. However, the [UCC] provides rules of law, and section 2–207 establishes important legal principles to be employed to resolve complex contract disputes arising from the exchange of business forms. Section 2–207 was intended to provide some degree of certainty in this otherwise ambiguous area of contract law. In our view, it is unreasonable and contrary to the policy behind the [UCC] merely to turn the issue over to the uninformed speculation of the jury left to apply its own particular sense of equity.
*Mead Corp.,* 654 F.2d at 1206 (citations omitted).

**20.** The parties may demonstrate their acceptance of a particular term either "orally or by informal correspondence", UCC 2–207, comment 1, or by placing the term in their respective form.

the legal principles detailed in section 2–207.

### B. *Application of § 2–207*

TSL advances several reasons why the terms of the box-top license should be incorporated into the parties's agreement under a § 2–207 analysis. First, TSL argues that the parties's contract was not formed until Step–Saver received the package, saw the terms of the box-top license, and opened the package, thereby consenting to the terms of the license. TSL argues that a contract defined without reference to the specific terms provided by the box-top license would necessarily fail for indefiniteness. Second, TSL argues that the box-top license was a conditional acceptance and counter-offer under § 2–207(1). Third, TSL argues that Step–Saver, by continuing to order and use the product with notice of the terms of the box-top license, consented to the terms of the box-top license.

### 1. Was the contract sufficiently definite?

TSL argues that the parties intended to license the copies of the program, and that several critical terms could only be determined by referring to the box-top license. Pressing the point, TSL argues that it is impossible to tell, without referring to the box-top license, whether the parties intended a sale of a copy of the program or a license to use a copy. TSL cites *Bethlehem Steel Corp. v. Litton Industries* in support of its position that any contract defined without reference to the terms of the box-top license would fail for indefiniteness.[21]

■ From the evidence, it appears that the following terms, at the least, were dis-

cussed and agreed to, apart from the box-top license: (1) the specific goods involved; (2) the quantity; and (3) the price. TSL argues that the following terms were only defined in the box-top license: (1) the nature of the transaction, sale or license; and (2) the warranties, if any, available. TSL argues that these two terms are essential to creating a sufficiently definite contract. We disagree.

> Section 2–204(3) of the UCC provides: Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Unlike the terms omitted by the parties in *Bethlehem Steel Corp.*, the two terms cited by TSL are not "gaping holes in a multi-million dollar contract that no one but the parties themselves could fill."[22] First, the rights of the respective parties under the federal copyright law if the transaction is characterized as a sale of a copy of the program are nearly identical to the parties's respective rights under the terms of the box-top license.[23] Second, the UCC provides for express and implied warranties if the seller fails to disclaim expressly those warranties.[24] Thus, even though warranties are an important term left blank by the parties, the default rules of the UCC fill in that blank.

We hold that contract was sufficiently definite without the terms provided by the box-top license.[25]

### 2. The box-top license as a counter-offer?

TSL advances two reasons why its box-top license should be considered a condi-

---

**21.** 507 Pa. 88, 488 A.2d 581 (1985).

**22.** 488 A.2d at 591.

**23.** The most significant difference would be that, under the terms of the license, Step–Saver could not transfer the copies without TSL's consent, while Step–Saver could do so under the federal copyright law if it had purchased the copy. Even if we assume that federal law would not preempt state law enforcement of this aspect of the license, this difference is not material to this case in that both parties agree that Step–Saver had the right to transfer the copies to purchasers of the Step–Saver multi-user system.

**24.** *See* UCC § 2–312, 2–313, 2–314, & 2–315.

**25.** *See, e.g., City University of New York v. Finalco, Inc.,* 514 N.Y.S.2d 244, 129 A.D.2d 494 (N.Y. App.Div.1987); *URSA Farmers Coop. Co. v. Trent,* 58 Ill.App.3d 930, 16 Ill.Dec. 348, 374 N.E.2d 1123 (Ill.App.Ct.1978).

tional acceptance under UCC § 2–207(1). First, TSL argues that the express language of the box-top license, including the integration clause and the phrase "opening this product indicates your acceptance of these terms", made TSL's acceptance "expressly conditional on assent to the additional or different terms".[26] Second, TSL argues that the box-top license, by permitting return of the product within fifteen days if the purchaser[27] does not agree to the terms stated in the license (the "refund offer"), establishes that TSL's acceptance was conditioned on Step–Saver's assent to the terms of the box-top license, citing *Monsanto Agricultural Products Co. v. Edenfield.*[28] While we are not certain that a conditional acceptance analysis applies when a contract is established by performance,[29] we assume that it does and consider TSL's arguments.

To determine whether a writing constitutes a conditional acceptance, courts have established three tests. Because neither Georgia nor Pennsylvania has expressly adopted a test to determine when a written confirmation constitutes a conditional acceptance, we consider these three tests to determine which test the state courts would most likely apply.[30]

Under the first test, an offeree's response is a conditional acceptance to the extent it states a term "materially altering the contractual obligations solely to the disadvantage of the offeror".[31] Pennsylvania, at least, has implicitly rejected this test. In *Herzog Oil Field Service, Inc.,*[32] a Pennsylvania Superior Court analyzed a term in a written confirmation under UCC § 2–207(2), rather than as a conditional acceptance even though the term materially altered the terms of the agreement to the sole disadvantage of the offeror.[33]

Furthermore, we note that adopting this test would conflict with the express provision of UCC § 2–207(2)(b). Under § 2–207(2)(b), additional terms in a written confirmation that "materially alter [the contract]" are construed "as proposals for addition to the contract", not as conditional acceptances.

■ A second approach considers an acceptance conditional when certain key words or phrases are used, such as a written confirmation stating that the terms of the confirmation are "the only ones upon which we will accept orders".[34] The third

---

26. UCC § 2–207(1).

27. In the remainder of the opinion, we will refer to the transaction as a sale for the sake of simplicity, but, by doing so, do not mean to resolve the sale-license question.

28. 426 So.2d 574 (Fla.Dist.Ct.App.1982).

29. Even though a writing is sent after performance establishes the existence of a contract, courts have analyzed the effect of such a writing under UCC § 2–207. *See Herzog Oil Field Serv. v. Otto Torpedo Co.,* 391 Pa.Super. 133, 570 A.2d 549, 550 (Pa.Super.Ct.1990); *McJunkin Corp. v. Mechanicals, Inc.,* 888 F.2d at 487. The official comment to UCC 2–207 suggests that, even though a proposed deal has been closed, the conditional acceptance analysis still applies in determining which writing's terms will define the contract.

 2. Under this Article a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained in the confirmation or in the acceptance falls within subsection (2) and must be regarded as a proposal for an added term *unless the acceptance is made conditional on the acceptance of the additional or different terms.*

30. *See Daitom, Inc.,* 741 F.2d at 1574–75.

31. *Daitom, Inc.,* 741 F.2d at 1576. *See, e.g., Roto–Lith Ltd. v. F.P. Bartlett & Co.,* 297 F.2d 497 (1st Cir.1962).

32. 391 Pa.Super. 133, 570 A.2d 549 (Pa.Super.Ct. 1990).

33. The seller/offeree sent a written confirmation that contained a term that provided for attorney's fees of 25 percent of the balance due if the account was turned over for collection. 570 A.2d at 550.

34. *Ralph Shrader, Inc. v. Diamond Int'l Corp.,* 833 F.2d 1210, 1214 (6th Cir.1987); *see McJunkin Corp.,* 888 F.2d at 488. Note that even though an acceptance contains the key phrase, and is conditional, these courts typically avoid finding a contract on the terms of the counteroffer by requiring the offeree/counterofferor to establish that the offeror assented to the terms of the counteroffer. Generally, acceptance of the goods, alone, is not sufficient to establish assent by the offeror to the terms of the counteroffer. *See, e.g., Ralph Shrader, Inc.,* 833 F.2d at 1215; *Diamond Fruit Growers, Inc.,* 794 F.2d

approach requires the offeree to demonstrate an unwillingness to proceed with the transaction unless the additional or different terms are included in the contract.[35]

Although we are not certain that these last two approaches would generate differing answers,[36] we adopt the third approach for our analysis because it best reflects the understanding of commercial transactions developed in the UCC. Section 2–207 attempts to distinguish between: (1) those standard terms in a form confirmation, which the party would like a court to incorporate into the contract in the event of a dispute; and (2) the actual terms the parties understand to govern their agreement. The third test properly places the burden on the party asking a court to enforce its form to demonstrate that a particular term is a part of the parties's commercial bargain.[37]

Using this test, it is apparent that the integration clause and the "consent by opening" language is not sufficient to render TSL's acceptance conditional. As other courts have recognized,[38] this type of language provides no real indication that the party is willing to forego the transaction if the additional language is not included in the contract.

The second provision provides a more substantial indication that TSL was willing to forego the contract if the terms of the box-top license were not accepted by Step–Saver. On its face, the box-top license states that TSL will refund the purchase price if the purchaser does not agree to the terms of the license.[39] Even with such a refund term, however, the offeree/counterofferor may be relying on the purchaser's investment in time and energy in reaching this point in the transaction to prevent the purchaser from returning the item. Because a purchaser has made a decision to buy a particular product and has actually obtained the product, the purchaser may use it despite the refund offer, regardless of the additional terms specified after the contract formed. But we need not decide whether such a refund offer could ever amount to a conditional acceptance; the undisputed evidence in this case demonstrates that the terms of the license were not sufficiently important that TSL would forego its sales to Step–Saver if TSL could not obtain Step–Saver's consent to those terms.

As discussed, Mr. Greebel testified that TSL assured him that the box-top license did not apply to Step–Saver, as Step–Saver was not the end user of the Multilink Advanced program. Supporting this testimony, TSL on two occasions asked Step–Saver to sign agreements that would put in for-

at 1443–44; *Coastal Indus. v. Automatic Steam Prods. Corp.*, 654 F.2d 375, 379 (5th Cir. Unit B Aug.1981). If the sole evidence of assent to the terms of the counteroffer is from the conduct of the parties in proceeding with the transaction, then the courts generally define the terms of the parties's agreement under § 2–207(3). *See, e.g., Diamond Fruit Growers, Inc.*, 794 F.2d at 1444.

**35.** *See, e.g., Daitom, Inc.*, 741 F.2d at 1576; *Idaho Power Co. v. Westinghouse Elec. Corp.*, 596 F.2d 924, 926 (9th Cir.1979).

**36.** Under the second approach, the box-top license might be considered a conditional acceptance, but Step–Saver, by accepting the product, would not be automatically bound to the terms of the box-top license. *See Diamond Fruit Growers, Inc.*, 794 F.2d at 1444. Instead, courts have applied UCC § 2–207(3) to determine the terms of the parties's agreement. The terms of the agreement would be those "on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act." UCC § 2–207(3). Because the writings of the parties did not agree

on the warranty disclaimer and limitation of remedies terms, the box-top license version of those terms would not be included in the parties's contract; rather, the default provisions of the UCC would govern.

**37.** *See Diamond Fruit Growers, Inc.*, 794 F.2d at 1444–45; *cf. Ralph Shrader, Inc.*, 833 F.2d at 1215.

**38.** *See, e.g., Idaho Power Co.*, 596 F.2d at 926–27.

**39.** One Florida Court of Appeals has accepted such an offer as a strong indication of a conditional acceptance. *Monsanto Agricultural Prods. Co.*, 426 So.2d at 575–76. Note that the *Monsanto* warranty label was conspicuous and available to the purchaser before the contract for the sale of the herbicide was formed. When an offeree proceeds with a contract with constructive knowledge of the terms of the offer, the offeree is typically bound by those terms, making the conditional acceptance finding unnecessary to the result reached in *Monsanto.*

mal terms the relationship between Step–Saver and TSL. Both proposed agreements contained warranty disclaimer and limitation of remedy terms similar to those contained in the box-top license. Step–Saver refused to sign the agreements; nevertheless, TSL continued to sell copies of Multilink Advanced to Step–Saver.

Additionally, TSL asks us to infer, based on the refund offer, that it was willing to forego its sales to Step–Saver unless Step–Saver agreed to the terms of the box-top license. Such an inference is inconsistent with the fact that both parties agree that the terms of the box-top license *did not represent the parties's agreement* with respect to Step–Saver's right to transfer the copies of the Multilink Advanced program. Although the box-top license prohibits the transfer, by Step–Saver, of its copies of the program, both parties agree that Step–Saver was entitled to transfer its copies to the purchasers of the Step–Saver multi-user system. Thus, TSL was willing to proceed with the transaction despite the fact that one of the terms of the box-top license was not included in the contract between TSL and Step–Saver. We see no basis in the terms of the box-top license for inferring that a reasonable offeror would understand from the refund offer that certain terms of the box-top license, such as the warranty disclaimers, were essential to TSL, while others such as the non-transferability provision were not.

Based on these facts, we conclude that TSL did not clearly express its unwillingness to proceed with the transactions unless its additional terms were incorporated into the parties's agreement. The box-top license did not, therefore, constitute a conditional acceptance under UCC § 2–207(1).

3. Did the parties's course of dealing establish that the parties had excluded any express or implied warranties associated with the software program?

TSL argues that because Step–Saver placed its orders for copies of the Multilink Advanced program with notice of the terms of the box-top license, Step–Saver is bound by the terms of the box-top license. Essentially, TSL is arguing that, even if the terms of the box-top license would not become part of the contract if the case involved only a single transaction, the repeated expression of those terms by TSL eventually incorporates them within the contract.

Ordinarily, a "course of dealing" or "course of performance" analysis focuses on the actions of the parties with respect to a particular issue.[40] If, for example, a supplier of asphaltic paving material on two occasions gives a paving contractor price protection, a jury may infer that the parties have incorporated such a term in their agreement by their course of performance.[41] Because this is the parties's first serious dispute, the parties have not previously taken any action with respect to the matters addressed by the warranty disclaimer and limitation of liability terms of the box-top license. Nevertheless, TSL seeks to extend the course of dealing analysis to this case where the only action has been the repeated sending of a particular form by TSL. While one court has concluded that terms repeated in a number of written confirmations eventually become part of the contract even though neither party ever takes any action with respect to the issue addressed by those terms,[42] most

---

**40.** A "course of performance" refers to actions with respect to the contract taken after the contract has formed. UCC § 2–208(1). "A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." UCC § 1–205.

**41.** See *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772 (9th Cir.1981).

**42.** See *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709, 714–15 (7th Cir.1987). As support for its position, the *Schulze* Court cites *Barliant v. Follett Corp.*, 138 Ill.App.3d 756, 91 Ill.Dec. 677, 483 N.E.2d 1312 (Ill.App.Ct.1985). Yet, the facts and result in *Barliant* do not support the reasoning in *Schulze*. In *Barliant*, the buyer had paid some twenty-four invoices, which included charges for freight and warehousing even though the agreement specified charges were F.O.B. The court found that the buyer had paid the invoices with knowledge of the additional charge for freight and warehous-

courts have rejected such reasoning.[43]

■ For two reasons, we hold that the repeated sending of a writing which contains certain standard terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing which would incorporate a term of the writing otherwise excluded under § 2–207. First, the repeated exchange of forms by the parties only tells Step–Saver that TSL *desires* certain terms. Given TSL's failure to obtain Step–Saver's express assent to these terms before it will ship the program, Step–Saver can reasonably believe that, while TSL desires certain terms, it has agreed to do business on other terms—those terms expressly agreed upon by the parties. Thus, even though Step–Saver would not be surprised[44] to learn that TSL desires the terms of the box-top license, Step–Saver might well be surprised to learn that the terms of the box-top license have been incorporated into the parties's agreement.

Second, the seller in these multiple transaction cases will typically have the opportunity to negotiate the precise terms of the parties's agreement, as TSL sought to do in this case. The seller's unwillingness or inability to obtain a negotiated agreement reflecting its terms strongly suggests that, while the seller would like a court to incorporate its terms if a dispute were to arise, those terms are not a part of the parties's commercial bargain. For these reasons, we are not convinced that TSL's unilateral act of repeatedly sending copies of the box-top license with its product can establish a course of dealing between TSL and Step–Saver that resulted in the adoption of the terms of the box-top license.

With regard to more specific evidence as to the parties's course of dealing or performance, it appears that the parties have not incorporated the warranty disclaimer into their agreement. First, there is the evidence that TSL tried to obtain Step–Saver's express consent to the disclaimer and limitation of damages provision of the box-top license. Step–Saver refused to sign the proposed agreements. Second, when first notified of the problems with the program, TSL spent considerable time and energy attempting to solve the problems identified by Step–Saver.

Course of conduct is ordinarily a factual issue. But we hold that the actions of TSL in repeatedly sending a writing, whose terms would otherwise be excluded under UCC § 2–207, cannot establish a course of conduct between TSL and Step–Saver that adopted the terms of the writing.

### 4. Public policy concerns.

TSL has raised a number of public policy arguments focusing on the effect on the software industry of an adverse holding concerning the enforceability of the box-top license. We are not persuaded that requiring software companies to stand behind representations concerning their products will inevitably destroy the software industry. We emphasize, however, that we are following the well-established distinction between conspicuous disclaimers made available before the contract is formed and

ing. Because of this *conduct with respect to the term in question,* the buyer waived any right to complain that the charges should not have been included. 91 Ill.Dec. at 679–80, 483 N.E.2d at 1314–15. In contrast, in *Schulze,* neither party had taken any action with respect to the arbitration provision. Because no disputes had arisen, there was no conduct by either party indicating how disputes were to be resolved. Nevertheless, the *Schulze* Court held that, because the provision had been repeated in nine previous invoices, it became part of the parties's bargain. 831 F.2d at 715. We note that the Seventh Circuit refused to follow *Schulze* in a more recent case raising the same issue. *See Trans–*

*Aire Int'l v. Northern Adhesive Co.,* 882 F.2d 1254, 1262–63 & n. 9 (7th Cir.1989).

**43.** *See, e.g., Trans–Aire Int'l v. Northern Adhesive Co.,* 882 F.2d at 1262–63 & n. 9; *Diamond Fruit Growers, Inc.,* 794 F.2d at 1445; *Tuck Industries v. Reichhold Chemicals, Inc.,* 542 N.Y.S.2d 676, 678, 151 A.D.2d 566 (N.Y.App.Div.1989); *Southeastern Adhesives Co.,* 366 S.E.2d at 507–08.

**44.** *Cf.* UCC § 2–207, comment 4 (suggesting that terms that "materially alter" a contract are those that would result in "surprise or hardship if incorporated without express awareness by the other party").

disclaimers made available only after the contract is formed.[45] When a disclaimer is not expressed until after the contract is formed, UCC § 2-207 governs the interpretation of the contract, and, between merchants, such disclaimers, to the extent they materially alter the parties's agreement, are not incorporated into the parties's agreement.

If TSL wants relief for its business operations from this well-established rule, their arguments are better addressed to a legislature than a court. Indeed, we note that at least two states have enacted statutes that modify the applicable contract rules in this area,[46] but both Georgia and Pennsylvania have retained the contract rules provided by the UCC.

## C. The Terms of the Contract

■ Under section 2-207, an additional term detailed in the box-top license will not be incorporated into the parties's contract if the term's addition to the contract would materially alter the parties's agreement.[47] Step-Saver alleges that several representations made by TSL constitute express warranties, and that valid implied warranties

were also a part of the parties's agreement. Because the district court considered the box-top license to exclude all of these warranties, the district court did not consider whether other factors may act to exclude these warranties. The existence and nature of the warranties is primarily a factual question that we leave for the district court,[48] but assuming that these warranties were included within the parties's original agreement, we must conclude that adding the disclaimer of warranty and limitation of remedies provisions from the box-top license would, as a matter of law, substantially alter the distribution of risk between Step-Saver and TSL.[49] Therefore, under UCC § 2-207(2)(b), the disclaimer of warranty and limitation of remedies terms of the box-top license did not become a part of the parties's agreement.[50]

Based on these considerations, we reverse the trial court's holding that the parties intended the box-top license to be a final and complete expression of the terms of their agreement. Despite the presence of an integration clause in the box-top license, the box-top license should have been treated as a written confirmation contain-

45. *Compare Hill v. BASF Wyandotte Corp.,* 696 F.2d 287, 290-91 (4th Cir.1982). In that case, a farmer purchased seventy-three five gallon cans of a herbicide from a retailer. Because the disclaimer was printed conspicuously on each can, the farmer had constructive knowledge of the terms of the disclaimer before the contract formed. As a result, when he selected each can of the herbicide from the shelf and purchased it, the law implies his assent to the terms of the disclaimer. *See also Bowdoin v. Showell Growers, Inc.,* 817 F.2d 1543, 1545 (11th Cir.1987) (disclaimers that were conspicuous before the contract for sale has formed are effective; post-sale disclaimers are ineffective); *Monsanto Agricultural Prods. Co. v. Edenfield,* 426 So.2d at 575-76.

46. Louisiana Software License Enforcement Act, La.R.S. §§ 51:1961-1966 (1987); Illinois Software Enforcement Act, Ill.Ann.Stat. ch. 29, para. 801-808 (Smith-Hurd 1987).

47. UCC § 2-207(2)(b).

48. For example, questions exist as to: (1) whether the statements by TSL were representations of fact, or mere statements of opinion; (2)

whether the custom in the trade is to exclude warranties and limit remedies in contracts between a software producer and its dealer; (3) whether Step-Saver relied on TSL's alleged representations, or whether these warranties became a basis of the parties's bargain; and (4) whether Step-Saver's testing excluded some or all of these warranties. From the record, it appears that most of these issues are factual determinations that will require a trial, as did the warranty claims against Wyse. But we leave these issues open to the district court on remand.

49. *See Valtrol, Inc. v. General Connectors Corp.,* 884 F.2d 149, 155 (4th Cir.1989); *Trans-Aire Int'l v. Northern Adhesive Co.,* 882 F.2d at 1262-63; UCC § 2-207, official comment 4.

50. The following recent cases reach a similar conclusion concerning indemnity or warranty disclaimers contained in writings exchanged after the contract had formed: *McJunkin Corp.,* 888 F.2d at 488-89; *Valtrol, Inc. v. General Connectors Corp.,* 884 F.2d at 155; *Trans-Aire Int'l v. Northern Adhesive Co.,* 882 F.2d at 1262-63; *Bowdoin,* 817 F.2d at 1545-46; *Diamond Fruit Growers, Inc.,* 794 F.2d at 1445; *Tuck*

ing additional terms.[51] Because the warranty disclaimer and limitation of remedies terms would materially alter the parties's agreement, these terms did not become a part of the parties's agreement. We remand for further consideration the express and implied warranty claims against TSL.

## III. THE INTENTIONAL MISREPRESENTATION CLAIM AGAINST TSL

We review the trial court's decision to grant a directed verdict on the intentional misrepresentation claim *de novo*.[52] We ask whether, considering the evidence in the light most favorable to Step–Saver, a reasonable jury could find, by clear and convincing evidence,[53] each essential element of Step–Saver's fraud claim: (1) a material misrepresentation; (2) an intention to deceive; (3) an intention to induce reliance; (4) justifiable reliance by the recipient upon the representation; and (5) damage to the recipient proximately caused by the misrepresentation.[54]

To support its intentional misrepresentation claim, Step–Saver argues that TSL made specific claims, in its advertisement and in statements by its sales representatives, that the Multilink Advanced program was compatible with various MS–DOS application programs and with the Wyse terminal. To demonstrate that TSL made these compatibility representations with an intent to deceive, Step–Saver refers to several statements made in deposition testimony by the co-founders of TSL, and argues that these statements are sufficient to establish that TSL knew these compatibility representations were false at the time they were made. In particular, Step–Saver points to the statement by Mr. Robertson, one of TSL's co-founders, that he did not know of any programs "completely compatible" with Multilink Advanced.

In determining whether Mr. Robertson's testimony will support an inference of fraudulent intent, we, like the experts at trial, distinguish between compatibility, or practical compatibility, and complete, absolute, or theoretical compatibility. If two products are completely compatible, they will work properly together in every possible situation, every time. As Mr. Robertson explained, "complete compatibility is almost virtually impossible to obtain". On the other hand, two products are compatible, within the standards of the computer industry, if they work together almost every time in almost every possible situation.[55]

It is undisputed that the representations made by the sales representatives referred to practical compatibility, while Mr. Robertson's testimony referred to complete compatibility. Because of the differences between practical and complete compatibility, as those terms are used in the industry, we agree with the district court that Mr. Robertson's testimony about "complete compatibility" will not support a finding, under the clear and convincing standard, that TSL knew its representations concerning practical compatibility were false. In context, Mr. Robertson's statement was simply an expression of technical fact, not an indication that he knew that Multilink Advanced failed to satisfy industry standards for practical compatibility.

*Industries,* 542 N.Y.S.2d at 678; *Southeastern Adhesives Co.,* 366 S.E.2d at 507–08.

51. *See Idaho Power Co.,* 596 F.2d at 925–27 (applying UCC § 2–207 despite presence of integration clause in written confirmation).

52. *See, e.g., Indian Coffee Corp. v. Proctor & Gamble Co.,* 752 F.2d 891, 894 (3d Cir.), *cert. denied,* 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985).

53. *See Beardshall v. Minuteman Press Int'l, Inc.,* 664 F.2d 23, 26 (3d Cir.1981); *Snell v. State Examining Bd.,* 490 Pa. 277, 281, 416 A.2d 468, 470 (1980).

54. *See Kinnel v. Mid–Atlantic Mausoleums, Inc.,* 850 F.2d 958, 963–64 (3d Cir.1988); *Scaife Co. v. Rockwell–Standard Corp.,* 446 Pa. 280, 285, 285 A.2d 451, 454 (1971), *cert. denied,* 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972).

55. We disagree with the holding by the district court that a representation of compatibility is a statement of opinion, rather than fact. Compatibility between two computer products can be tested and determined. While two computer products are not likely to be perfectly compatible, the question of whether the degree of compatibility is consistent with industry standards is a question generally for the jury, not the judge.

## IV. THE IMPLIED WARRANTY OF MERCHANTABILITY CLAIM AGAINST WYSE

Step–Saver argues that there was sufficient evidence in the record to support a jury finding that the Wyse terminal was not "fit for the ordinary purposes for which such goods are used",[56] and that the trial judge should have permitted the jury to decide the implied warranty of merchantability issue.

The only evidence introduced by Step–Saver on this issue was that certain features on the WY–60 terminal were not compatible with the Multilink Advanced operating environment. For example, the WY–60 terminal originally had repeatable, instead of toggle,[57] NUM LOCK and CAPS LOCK keys. The combination of repeatable keys and the Multilink Advanced program caused the NUM LOCK or CAPS LOCK indicated by the terminal to become out of synchronicity with the actual setting followed by the computer. As a result, a terminal's screen and keyboard might indicate that CAPS LOCK was on, when in fact it was off. Because of this, a user might type an entire document believing that the document was in all capital letters, only to discover upon printing that the document was in all lower case letters.

■ While this evidence demonstrates some compatibility problems between the WY–60 terminal and the Multilink Advanced program, Wyse introduced undisputed testimony that a user would encounter the same compatibility problems when using the Multilink Advanced operating environment on either a Kimtron KT–7 terminal, or a Link terminal, the terminals offered by Wyse's two primary competitors.

Undisputed testimony also established that Wyse had sold over one million WY–60 terminals since the terminal's introduction in April of 1986, and that the WY–60 was the top-selling terminal in its class.

Furthermore, undisputed testimony by Wyse engineers established that the WY–60 terminals were built to industry-standard specifications for terminals designed to work with a multi-user system based on the IBM AT or XT. It is apparent that when the pieces of a system intended to work together are designed and built independently, each piece must conform to certain specifications if the pieces are to work together properly. Just as a nut and bolt must be built in a certain manner to insure their fit, so too the components of a multi-user system. Just as a bolt, built to industry standards for a certain size and thread, cannot be considered unfit for its ordinary use simply because a particular nut does not fit it, so too the WY–60 terminal.

Under a warranty of merchantability, the seller warrants only that the goods are of acceptable quality "when compared to that generally acceptable in the trade for goods of the kind."[58] Because the undisputed testimony established that the WY–60 terminal conformed to the industry standard for terminals designed to operate in conjunction with an IBM AT, the evidence of incompatibility with the Multilink Advanced operating system is not sufficient to support a finding that Wyse breached the implied warranty of merchantability.[59]

## V. EVIDENTIARY RULINGS

We have carefully reviewed the record regarding the evidentiary rulings. For the reasons given on these two issues in the

---

**56.** UCC § 2–314(2)(c).

**57.** If a user presses and holds a repeatable NUM LOCK key, the terminal will switch back and forth between NUM LOCK on and NUM LOCK off as long as the user holds down the key. In contrast, if a user presses and holds a toggle key, the terminal will switch from the present setting to the other setting. Even if the user continues to hold the key, the setting will not change but once. In order to change the setting back to the prior setting, the user must release the key and press it again.

**58.** *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 424 (6th Cir.), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981); *see also Dugan & Meyers Constr. Co. v. Worthington Pump Corp.* (USA), 746 F.2d 1166, 1176 (6th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985).

**59.** *See In re Franklin Computer Corp.,* 57 B.R. 155, 157 (Bankr.E.D.Pa.1986).

district court's memorandum opinion rejecting Step–Saver's motion for a new trial,[60] we hold that the exclusion of the unsent letter and the refusal to permit rebuttal testimony on the issue of the ordinary uses of the WY–60 terminal did not constitute an abuse of discretion.

## VI.

We will reverse the holding of the district court that the parties intended to adopt the box-top license as the complete and final expression of the terms of their agreement. We will remand for further consideration of Step–Saver's express and implied warranty claims against TSL. Finding a sufficient basis for the other decisions of the district court, we will affirm in all other respects.

---

**60.** *Step–Saver Data Sys., Inc. v. Wyse Tech.,* 752 F.Supp. 181, 192–93 (E.D.Pa.1990).