**DIAMOND FRUIT GROWERS, INC., an Oregon corporation, Plaintiff,**

**v.**

**KRACK CORPORATION, an Illinois corporation, Defendant/Third-Party Plaintiff-Appellee,**

**v.**

**METAL–MATIC, INC., a Minnesota corporation, Third-Party Defendant-Appellant.**

**No. 85–3701.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1986.

Decided July 22, 1986.

C.F. Bradley, Schwenn, Bradley, Batchelor, Brisbee & Stockton, Hillsboro, Or., for third-party defendant-appellant.

Peter R. Chamberlain, Bodyfelt, Mount, Stroup & Chamberlain, Portland, Or., for defendant/third-party plaintiff-appellee.

Before FLETCHER, ALARCON, and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

Metal-Matic, Inc. (Metal-Matic) appeals from judgment entered after a jury verdict in favor of Krack Corporation (Krack) on Krack's third-party complaint against Metal-Matic. Metal-Matic also appeals from the district court's denial of its motion for judgment n.o.v. We have jurisdiction under 28 U.S.C. § 1291 (1982) and affirm.

## FACTS AND PROCEEDINGS BELOW

Krack is a manufacturer of cooling units that contain steel tubing it purchases from outside suppliers. Metal-Matic is one of Krack's tubing suppliers. At the time this dispute arose, Metal-Matic had been supplying tubing to Krack for about ten years. The parties followed the same course of dealing during the entire ten years. At the beginning of each year, Krack sent a blanket purchase order to Metal-Matic stating how much tubing Krack would need for the year. Then, throughout the year as Krack needed tubing, it sent release purchase orders to Metal-Matic requesting that tubing be shipped. Metal-Matic responded to Krack's release purchase orders by sending Krack an acknowledgment form and then shipping the tubing.[1]

Metal-Matic's acknowledgment form disclaimed all liability for consequential damages and limited Metal-Matic's liability for defects in the tubing to refund of the purchase price or replacement or repair of the tubing. As one would expect, these terms were not contained in Krack's purchase order. The following statement was printed on Metal-Matic's form: "Metal-Matic, Inc.'s acceptance of purchaser's offer or its offer to purchaser is hereby expressly made conditional to purchaser's acceptance of the terms and provisions of the acknowledgment form." This statement and the disclaimer of liability were on the back of the acknowledgment form. However, printed at the bottom of the front of the form in bold-face capitals was the following statement: "SEE REVERSE SIDE FOR TERMS AND CONDITIONS OF SALE."

On at least one occasion during the ten-year relationship between Metal-Matic and Krack, Allen Zver, Krack's purchasing manager, discussed the limitation of warranty and disclaimer of liability terms contained in Metal-Matic's acknowledgment form with Robert Van Krevelen, Executive Vice President of Metal-Matic. Zver told Van Krevelen that Krack objected to the terms and tried to convince him to change them, but Van Krevelen refused to do so. After the discussions, Krack continued to accept and pay for tubing from Metal-Matic.[2]

In February 1981, Krack sold one of its cooling units to Diamond Fruit Growers, Inc. (Diamond) in Oregon, and in September 1981, Diamond installed the unit in a controlled-atmosphere warehouse. In January 1982, the unit began leaking ammonia from a cooling coil made of steel tubing.

After Diamond discovered that ammonia was leaking into the warehouse, Joseph Smith, the engineer who had been responsible for building Diamond's controlled-atmosphere warehouses, was called in to find the source of the leak. Smith testified that he found a pinhole leak in the cooling coil of the Krack cooling unit. Smith inspected the coil while it was still inside the unit. He last inspected the coil on April 23, 1982. The coil then sat in a hall at Diamond's warehouse until May, 1984, when John Myers inspected the coil for Metal-Matic.

Myers cut the defective tubing out of the unit and took it to his office. At his office,

1. The blanket purchase order apparently did no more than establish Krack's willingness to purchase an amount of tubing during the year. The parties' conduct indicates that they intended to establish their contract based on Krack's release purchase orders and Metal-Matic's acknowledgments sent in response to those purchase orders.

2. Krack contends that there is no evidence of when these discussions took place. That is not the case. Van Krevelen testified that at least some discussions were held before this incident arose. That testimony is not contradicted.

he did more cutting on the tubing. After Myers inspected the tubing, it was also inspected by Bruce Wong for Diamond and Paul Irish for Krack.

Diamond sued Krack to recover the loss in value of fruit that it was forced to remove from the storage room as a result of the leak. Krack in turn brought a third-party complaint against Metal-Matic and Van Huffel Tube Corporation (Van Huffel), another of its tubing suppliers, seeking contribution or indemnity in the event it was held liable to Diamond. At the close of the evidence, both Metal-Matic and Van Huffel moved for a directed verdict on the third party complaint. The court granted Van Huffel's motion based on evidence that the failed tubing was not manufactured by Van Huffel. The court denied Metal-Matic's motion.

The jury returned a verdict in favor of Diamond against Krack. It then found that Krack was entitled to contribution from Metal-Matic for thirty percent of Diamond's damages. Metal-Matic moved for judgment n.o.v. The court denied that motion and entered judgment on the jury verdict.

Metal-Matic raises two grounds for reversal. First, Metal-Matic contends that as part of its contract with Krack, it disclaimed all liability for consequential damages and specifically limited its liablity for defects in the tubing to refund of the purchase price or replacement or repair of the tubing. Second, Metal-Matic asserts that the evidence does not support a finding that it manufactured the tubing in which the leak developed or that it caused the leak. We address each of these contentions in turn.

### STANDARD OF REVIEW

Metal-Matic's contention that its disclaimers are part of its contract with Krack

presents questions of statutory and contract interpretation, which are questions of law reviewed *de novo*. *United States v. Binder*, 769 F.2d 595, 600 (9th Cir.1985); *Marchese v. Shearson Hayden Stone, Inc.*, 734 F.2d 414, 417 (9th Cir.1984); *see United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The jury verdict and the district court's denial of Metal-Matic's motion for judgment n.o.v. will not be reversed by this court if there is substantial evidence to support a finding for Krack. *See Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984).

### DISCUSSION

#### A. *Metal-Matic's Disclaimer of Liability for Consequential Damages*

If the contract between Metal-Matic and Krack contains Metal-Matic's disclaimer of liability, Metal-Matic is not liable to indemnify Krack for part of Diamond's damages. Therefore, the principal issue before us on this appeal is whether Metal-Matic's disclaimer of liability became part of the contract between these parties.

Relying on Uniform Commercial Code (U.C.C.) § 2–207, Or.Rev.Stat. § 72.2070 (1985),[3] Krack argues that Metal-Matic's disclaimer did not become part of the contract. Metal-Matic, on the other hand, argues that section 2–207 is inapplicable to this case because the parties discussed the disclaimer, and Krack assented to it.

■ Krack is correct in its assertion that section 2–207 applies to this case. One intended application of section 2–207 is to commercial transactions in which the parties exchange printed purchase order and acknowledgment forms. *See* U.C.C. § 2–207 comment 1.[4] The drafters of the

---

3. Metal-Matic's acknowledgment form specified that Minnesota law would apply to the contract, but the parties tried this case based on Oregon law and have relied on Oregon law in this court. We will therefore apply Oregon law to this appeal.

4. Although the official comments to the U.C.C. are not included in Oregon Revised Statutes, the Oregon courts rely on them. *See, e.g., Willamette-Western Corp. v. Lowry*, 279 Or. 525, 532, 568 P.2d 1339, 1342 (1977).

U.C.C. recognized that "[b]ecause the [purchase order and acknowledgment] forms are oriented to the thinking of the respective drafting parties, the terms contained in them often do not correspond." *Id.* Section 2–207 is an attempt to provide rules of contract formation in such cases. In this case, Krack and Metal-Matic exchanged purchase order and acknowledgment forms that contained different or additional terms. This, then, is a typical section 2–207 situation. The fact that the parties discussed the terms of their contract after they exchanged their forms does not put this case outside section 2–207. *See* 3 R. Duesenburg & L. King, *Sales and Bulk Transfers under the Uniform Commercial Code* (Bender's U.C.C. Service) § 3.05[2] (1986). Section 2–207 provides rules of contract formation in cases such as this one in which the parties exchange forms but do not agree on all the terms of their contract.

A brief summary of section 2–207 is necessary to an understanding of its application to this case.[5] Section 2–207 changes the common law's mirror-image rule for transactions that fall within article 2 of the U.C.C. At common law, an acceptance that varies the terms of the offer is a counteroffer and operates as a rejection of the original offer. *See Idaho Power Co. v. Westinghouse Electric Corp.,* 596 F.2d 924, 926 (9th Cir.1979). If the offeror goes ahead with the contract after receiving the counteroffer, his performance is an acceptance of the terms of the counteroffer. *See C.*

*Itoh & Co. v. Jordan International Co.,* 552 F.2d 1228, 1236 (7th Cir.1977); J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 1–2 at 34 (2d ed. 1980).

Generally, section 2–207(1) "converts a common law counteroffer into an acceptance even though it states additional or different terms." *Idaho Power,* 596 F.2d at 926; *see* U.C.C. § 2–207(1). The only requirement under section 2–207(1) is that the responding form contain a definite and seasonable expression of acceptance. The terms of the responding form that correspond to the offer constitute the contract. Under section 2–207(2), the additional terms of the responding form become proposals for additions to the contract. Between merchants the additional terms become part of the contract unless the offer is specifically limited to its terms, the offeror objects to the additional terms, or the additional terms materially alter the terms of the offer. U.C.C. § 2–207(2); *see* J. White & R. Summers, § 1–2 at 32.

However, section 2–207(1) is subject to a proviso. If a definite and seasonable expression of acceptance expressly conditions acceptance on the offeror's assent to additional or different terms contained therein, the parties' differing forms do not result in a contract unless the offeror assents to the additional terms. *See* J. White & R. Summers, § 1–2 at 32–33. If the offeror assents, the parties have a contract and the additional terms are a part of that contract.

---

5. U.C.C. § 2–207, Or.Rev.Stat. § 72.2070, provides:

**Additional terms in acceptance or confirmation.**

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of the Uniform Commercial Code.

If, however, the offeror does not assent, but the parties proceed with the transaction as if they have a contract, their performance results in formation of a contract. U.C.C. § 2–207(3). In that case, the terms of the contract are those on which the parties' forms agree plus any terms supplied by the U.C.C. *Id.; see Boise Cascade Corp. v. Etsco, Ltd.,* 39 U.C.C.Rep. Serv. (Callaghan) 410, 414 (D.Or.1984); J. White & R. Summers, § 1–2 at 34.

In this case, Metal-Matic expressly conditioned its acceptance on Krack's assent to the additional terms contained in Metal-Matic's acknowledgment form. That form tracks the language of the section 2–207(1) proviso, stating that "Metal-Matic, Inc.'s acceptance ... is hereby *expressly made conditional* to purchaser's acceptance of the terms and provisions of the acknowledgment form." (emphasis added). *See C. Itoh & Co.,* 552 F.2d at 1235. Therefore, we must determine whether Krack assented to Metal-Matic's limitation of liability term.

Metal-Matic argues that Krack did assent to the limitation of liability term. This argument is based on the discussions between Zver for Krack and Van Krevelen for Metal-Matic. Some time during the ten-year relationship between the companies, these two men discussed Krack's objections to the warranty and liability limitation terms in Metal-Matic's acknowledgment form. Krack attempted to persuade Metal-Matic to change its form, but Metal-Matic refused to do so. After the discussions, the companies continued to do business as in the past. Metal-Matic contends that Krack assented to the limitation of liability term when it continued to accept and pay for tubing after Metal-Matic insisted that the contract contain its terms.

To address Metal-Matic's argument, we must determine what constitutes assent to

additional or different terms for purposes of section 2–207(1). The parties have not directed us to any cases that analyze this question and our research has revealed none.[6] We therefore look to the language and structure of section 2–207 and to the purposes behind that section to determine the correct standard.

One of the principles underlying section 2–207 is neutrality. If possible, the section should be interpreted so as to give neither party to a contract an advantage simply because it happened to send the first or in some cases the last form. *See* J. White & R. Summers, § 1–2 at 26–27. Section 2–207 accomplishes this result in part by doing away with the common law's "last shot" rule. *See* 3 R. Duesenberg & L. King, § 3.05[1][a][iii] at 3–73. At common law, the offeree/counterofferor gets all of its terms simply because it fired the last shot in the exchange of forms. Section 2–207(3) does away with this result by giving neither party the terms it attempted to impose unilaterally on the other. *See id.* at 3–71. Instead, all of the terms on which the parties' forms do not agree drop out, and the U.C.C. supplies the missing terms.

Generally, this result is fair because both parties are responsible for the ambiguity in their contract. The parties could have negotiated a contract and agreed on its terms, but for whatever reason, they failed to do so. Therefore, neither party should get its terms. *See* 3 R. Duesenberg & L. King, § 3.05[2] at 3–88. However, as White and Summers point out, resort to section 2–207(3) will often work to the disadvantage of the seller because he will "wish to undertake less responsibility for the quality of his goods than the Code imposes or else wish to limit his damages liability more narrowly than would the Code." J. White & R. Summers, § 1–2 at 34. Nevertheless, White and Summers rec-

---

6. The United States District Court for the District of Columbia has decided a case on this issue. However, the case is of little precedential value because the court provided no analysis to support its decision. In *McKenzie v. Alla-Ohio Coals, Inc.,* 29 U.C.C.Rep.Serv. (Callaghan) 852, 855 (D.D.C.1979), the offeror objected to a term in the offeree's form. The offeree reaffirmed that term, and the offeror made no further objection. The court held that the term was part of the contract because the parties continued to behave as if they had a contract after the offeree reaffirmed the term.

ommend that section 2–207(3) be applied in such cases. *Id.* We agree. Application of section 2–207(3) is more equitable than giving one party its terms simply because it sent the last form. Further, the terms imposed by the code are presumably equitable and consistent with public policy because they are statutorily imposed. *See* 3 R. Duesenberg & L. King, § 3.05[2] at 3–88.

■ With these general principles in mind, we turn now to Metal-Matic's argument that Krack assented to the disclaimer when it continued to accept and pay for tubing once Metal-Matic indicated that it was willing to sell tubing only if its warranty and liability terms were part of the contract. Metal-Matic's argument is appealing. Sound policy supports permitting a seller to control the terms on which it will sell its products, especially in a case in which the seller has indicated both in writing and orally that those are the only terms on which it is willing to sell the product. Nevertheless, we reject Metal-Matic's argument because we find that these considerations are outweighed by the public policy reflected by Oregon's enactment of the U.C.C.

If we were to accept Metal-Matic's argument, we would reinstate to some extent the common law's last shot rule. To illustrate, assume that the parties in this case had sent the same forms but in the reverse order and that Krack's form contained terms stating that Metal-Matic is liable for all consequential damages and conditioning acceptance on Metal-Matic's assent to Krack's terms. Assume also that Metal-Matic objected to Krack's terms but Krack refused to change them and that the parties continued with their transaction anyway. If we applied Metal-Matic's argument in that case, we would find that Krack's term was part of the contract because Metal-Matic continued to ship tubing to Krack after Krack reaffirmed that it

would purchase tubing only if Metal-Matic were fully liable for consequential damages. Thus, the result would turn on which party sent the last form, and would therefore be inconsistent with section 2–207's purpose of doing away with the last shot rule.

That result is avoided by requiring a specific and unequivocal expression of assent on the part of the offeror when the offeree conditions its acceptance on assent to additional or different terms. If the offeror does not give specific and unequivocal assent but the parties act as if they have a contract, the provisions of section 2–207(3) apply to fill in the terms of the contract. Application of section 2–207(3) is appropriate in that situation because by going ahead with the transaction without resolving their dispute, both parties are responsible for introducing ambiguity into the contract. Further, in a case such as this one, requiring the seller to assume more liability than it intends is not altogether inappropriate. The seller is most responsible for the ambiguity because it inserts a term in its form that requires assent to additional terms and then does not enforce that requirement. If the seller truely does not want to be bound unless the buyer assents to its terms, it can protect itself by not shipping until it obtains that assent. *See C. Itoh & Co.*, 552 F.2d at 1238.

We hold that because Krack's conduct did not indicate unequivocally that Krack intended to assent to Metal-Matic's terms, that conduct did not amount to the assent contemplated by section 2–207(1). *See* 3 R. Duesenberg & L. King, § 3.05[1][a][iii] at 3–74.[7]

### B. *Sufficiency of the Evidence*

Metal-Matic next argues that there is insufficient evidence to support the jury verdict against it. First, Metal-Matic argues that the evidence does not support a

---

7. Metal-Matic also argues that testimony of Krack's own employee shows that both parties understood that Metal-Matic's disclaimers were part of the contract. However, the testimony

upon which Metal-Matic bases this argument shows only that Krack was aware of Metal-Matic's position, not that Metal-Matic had adopted or agreed to it.

finding that it manufactured the tubing in which the leak developed. Second, Metal-Matic argues that even if it manufactured the failed tubing, the evidence establishes that it could not have caused the defect in the tubing. Although the evidence is contradictory on these issues, there is substantial evidence to support a jury verdict in favor of Krack.

### 1. *Did Metal-Matic Manufacture the Tubing that Failed?*

 From 1978 through 1981, when the unit involved in this case was manufactured, Krack purchased tubing only from Metal-Matic and Van Huffel. Metal-Matic leaves the bead on welds in the tubing it manufactures, and Van Huffel removes the bead from welds in its tubing. The bead was left on the welds in the tubing that developed the leak. Nevertheless, Metal-Matic argues that there is no proof that it manufactured this tubing. Metal-Matic's argument is based on testimony that before 1978, Krack also purchased tubing from several smaller suppliers, some of which left the bead on their welds and that Krack puts all of its tubing in common bins.

The evidence on this issue is contradictory. That being the case, it was the jury's responsibility to weigh the evidence and reach a decision. The jury reached a result that is supported by substantial evidence, and we will not disturb it. *See Mosesian,* 727 F.2d at 877.

### 2. *Did Metal-Matic Cause the Defect?*

 Three experts, Wong for Diamond, Myers for Metal-Matic, and Irish for Krack, testified that the hole they observed in the tubing was caused by a hacksaw. One expert, Smith for Diamond, testified that the hole he saw was a pinhole and that there were no saw grooves on the tubing when he inspected it. Smith was the first expert to inspect the cooling unit after the leak was discovered. The next expert to inspect the unit, Myers, did not do so until almost two years after Smith's last inspection. During that time the unit was left in a hall at Diamond's warehouse. When Myers did inspect the unit, he cut the leaky section of tubing out of the unit. He then did more cutting on that section of tubing at his office. The other two experts, Wong and Irish, saw the tubing after Myers inspected it.

Relying on the testimony that the hole in the tubing was caused by a hacksaw, Metal-Matic attempts to show that such a hole could only have been made by Krack. The testimony at trial established that both Krack and Metal-Matic have hacksaws on their premises, but Krack is more likely to use a hacksaw around the tubing than is Metal-Matic.

Again there is evidence that would support a finding on either side of this issue. The jury weighed the evidence and reached a verdict supported by substantial evidence. That verdict will not be disturbed on appeal. *See Mosesian,* 727 F.2d at 877.

The jury verdict is supported by the evidence and consistent with the U.C.C. Therefore, the district court did not err in denying Metal-Matic's motion for a directed verdict.

AFFIRMED.