ARIZONA RETAIL SYSTEMS, INC., an Arizona corporation, Plaintiff,

v.

The SOFTWARE LINK, INC., a Georgia corporation, Defendant.

No. CIV 91–1553 PHX RCB.

United States District Court, D. Arizona.

July 27, 1993.

Ray K. Harris, John J. Balitis, Jr., Fennemore Craig, Phoenix, AZ, for plaintiff.

James H. Marburger, Gust Rosenfeld, Phoenix, AZ, for defendant.

## AMENDED ORDER

BROOMFIELD, District Judge.

Plaintiff Arizona Retail Systems, Inc. (ARS) has brought claims against Defendant The Software Link, Inc. (TSL) arising out of certain purchases by ARS of software from TSL. ARS has moved for partial summary judgment on the issue of whether TSL effectively disclaimed implied warranties and alleged oral representations through provisions in a license agreement that accompanied each delivery of software. TSL responded to ARS's motion and filed a cross-motion for summary judgment, contending that, as a matter of law, the license agreement provides the exclusive remedy for plaintiff's claims. The court heard oral argument on the parties' motions on October 5, 1992, and now rules.

## BACKGROUND

TSL designs and sells software. This lawsuit regards the sale of a software operating system designed and sold by TSL known as PC–MOS. PC–MOS is designed to allow multi-user systems to access software applications from a central host computer, thereby eliminating the need to purchase individual software for each user.

ARS is a value-added retailer that, among other things, configures, markets, and services multi-user computer systems. Sometime in 1989, ARS' system manager, Allen Rude, contacted TSL to obtain information about PC–MOS. Approximately two years earlier, Rude had evaluated PC–MOS but, for a variety of performance-related reasons, decided not to purchase the system. Rude contacted TSL in 1989 because he had seen a magazine advertisement for an updated version of PC–MOS.

TSL telefaxed to Rude various advertisements and other promotional literature describing the new version of PC–MOS. The literature stated that the program was now operational and compatible as a multi-user operating system. Rude claims that he interpreted these representations to mean that the problems present in the earlier version had been corrected. The representations interested Rude because ARS had clients in need of an effective program to support multi-user networks.

After reading the information sent by TSL, Rude contacted TSL and discussed the updated PC–MOS with TSL employees. The contents of the discussion are debated. TSL alleges that PC–MOS was discussed only in general terms; ARS contends that the employees assured Rude that the software would be compatible with DOS operated programs and that the problems with the earlier version of PC–MOS had been corrected. In addition, ARS contends Rude informed TSL of the specific type of system ARS wanted to

support with PC–MOS and that TSL representatives assured Rude that PC–MOS would work with that system.

Rude ultimately ordered a copy of PC–MOS. It is unclear whether Rude ordered an evaluative copy of the system, which came with a live copy of the system, or whether Rude ordered a live copy and an evaluative copy accompanied the live copy. In any case, the materials Rude received stated that ARS could return the materials after a specified time period if ARS was not satisfied. Rude admits that he did not decide to keep the live copy of PC–MOS until he tested the evaluation disk. The materials were wrapped in "shrink wrap" plastic, upon which was fixed a Limited Use License Agreement. The Limited Use License Agreement (license agreement) included, among other things, the following provisions relevant to this case.

1. A clause stating that the customer has not purchased the software itself, but merely has obtained a personal, non-transferable license to use the program;

2. a disclaimer of all warranties, except for a warranty covering physical defects in the program disks;

3. a clause purporting to limit the purchaser's remedies to repair and replacement of defective disks, and to exclude all liability for damages caused by using the program;

4. an integration clause providing that the license was the final and complete expression of the parties' agreement;

5. a provision prohibiting the assignment of the program or license without the express prior consent of TSL; and

6. a provision purporting to trigger the purchaser's acceptance of the license upon opening the package.

After evaluating the system for about two hours, Rude decided to keep the system. Rude admits that he read the license agreement but thought that it was unenforceable and incapable of overriding the specific representations made to him by TSL employees.

ARS purchased many copies of PC–MOS from TSL over the next year. With respect to these purchases, ARS usually initiated the procedure by telephoning TSL to place an order. During the order calls, ARS and TSL agreed on the specific goods to be shipped by TSL, the quantity of the goods, and the price for the goods. TSL then would ship the goods together with invoices. It does not appear to be disputed that neither party made any reference to the warranty disclaimers or liability limitations during either the calls or on the invoices. The license agreement, however, appeared on the face of the packaging of each set of software sent by TSL to ARS.

ARS contends that it installed PC–MOS into a number of multi-user systems, which ARS then sold to clients. Some of the clients, particularly the Kimball and Curry law firm in Phoenix (K & C), experienced significant problems with their systems. K & C's first set of problems involved PC–MOS's incompatibility with WordPerfect, the word processing software installed by ARS. Specifically, PC–MOS allegedly degraded WordPerfect performance speed as well as various WordPerfect printing functions. In response to the complaints about performance speed and printing functions, TSL suggested that ARS purchase additional software to upgrade the PC–MOS system. In reliance on these representations, ARS purchased the upgrade packages.

The upgrade packages, however, caused a whole new set of problems. K & C suffered, among other things, frequent, random lock-ups of its system that resulted in the loss of hundreds of pages of documents. ARS kept in constant contact with TSL about the problems and TSL allegedly encouraged ARS to continue to correct any problems with the system and repeatedly assured ARS that any problems could be solved. After several months, ARS abandoned the repair effort. This suit eventually followed.

Apparently, TSL's software for multi-user systems has come under fire elsewhere as well. In *Step–Saver Data Systems v. Wyse Technology,* 939 F.2d 91 (3d Cir.1991), the Third Circuit addressed facts very similar, though not identical, to the facts of this case. In *Step–Saver,* the Third Circuit ruled on the effect of the identical license agreement present in this case. The court ruled against TSL, holding that the license agreement did

not constitute a part of the contract between the parties. ARS contends· that *Step–Saver* is on point with this case in all material respects. TSL responds that the facts of this case are different than the facts before the Third Circuit.

## LEGAL ANALYSIS

■ The parties appear to agree that Georgia law governs this dispute. Georgia has adopted all provisions of the Uniform Commercial Code that are relevant to this dispute. For sake of simplicity, the court when possible will refer to the relevant provisions in the U.C.C. rather than the corresponding provisions in the Georgia Code. Summary judgment is an appropriate device for resolving the issues presented by the parties because issues relating to contract formation and statutory construction are for the court. *See Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1442 (9th Cir.1986).

A. *The Relevant Provisions of the U.C.C.*

An understanding of two U.C.C. provisions is necessary to resolve the issues before the court.

1. Section 2–207

Section 2–207 provides:

**Additional Terms in Acceptance or Confirmation**

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of the [Code].

The drafters of the Uniform Commercial Code when adopting section 2–207 sought to abolish certain common law rules that made little sense in light of modern business practices. In the average case, a buyer makes an offer to purchase which a seller accepts either by tendering the desired goods or by promising to tender the desired goods at a certain time. The commercial world, however, has altered this basic process by injecting the regular use of forms into the buying and selling processes. Invoices, purchase orders, and confirmatory memoranda are passed between the parties to a contract and often contain terms, conditions, and clauses favorable to the sending party. Thus, in the absence of an agreement drafted contemporaneously with the formation of a contract that contains all the terms desired by each of the parties, it becomes very important to determine how the terms in the forms should be treated.

Before enactment of the Code, the courts held that each time a form was exchanged as part of an acceptance, a counter-offer was made if the terms of the form varied in any way from the terms of the original offer. If the original offeror proceeded with the contract despite the differing terms of the supposed acceptance, he would, by performance, constructively accept the "counter-offer" and be bound by its terms. *See Step–Saver*, 939 F.2d at 99. As a result, the terms of the party who sent the last form, typically the seller, would become the terms of the parties' contract. The drafters of the Uniform Commercial Code recognized that this result

made little sense, and thus formulated rules defining what constituted an "acceptance" and how to treat terms that differed in forms exchanged by the parties.

■ In essence, section 2–207, in many cases, turns what used to be counter-offers into acceptances. If, when responding to an offer, a party generally accepts the offer but adds some additional or inconsistent terms, the response nevertheless is considered an acceptance and the Code provides special rules as to how to treat the additional or inconsistent terms. The Code requires sellers who express general agreement with an offer, but who do not wish to consent to the offer unless certain terms are included in the agreement, to state expressly that their "acceptances" essentially are counter-offers.

Section 2–207 thus controls the situation in which the parties at some point in time come to a general agreement but have failed, in that oral or written agreement, to come to a mutual understanding on various terms requested by the parties. Under such circumstances, a contract is formed when the parties reach the general agreement and all other material terms not agreed upon are supplied by the Code's "gap fillers." *See* U.C.C. § 2–207(3)

2. Section 2–209

Section 2–207 addresses situations in which various terms proposed by the parties in the offer and acceptances processes were not agreed upon before the contract was formed under section 2–207(1).[1] Section 2–209 picks up where section 2–207 leaves off— i.e., after the formation of the contract. Section 2–209 thus sets forth rules for modifications of existing sales contracts.

B. *The Initial Purchase*

The parties treat the issues in this case as if only one contract existed between the parties. It appears to the court that the parties actually engaged in a number of separate contracts, and that the first contract entered into by the parties involves facts and circumstances materially different than the subsequent contracts. The court, therefore, will evaluate the initial purchase of software separately from the subsequent purchases, which appear to all have been conducted under similar circumstances.

The facts surrounding ARS's initial order of PC–MOS are not entirely clear. Whether Rude ordered an evaluation diskette from TSL or whether Rude ordered a regular software package that came with the evaluation diskette cannot be determined from the papers. To the extent that Rude ordered an evaluation diskette that came accompanied with a regular diskette, which Rude accepted by not returning, a different issue is presented with respect to the initial order of PC–MOS than with respect to the subsequent orders. Nevertheless, because it appears to the court that Rude did order an evaluation disk with the intent to first test the system, *see* Def. SoF pp. 4–5; Pl. SoF ¶ 11, the court has analyzed the effect of the license agreement on the initial transaction separately from the effect of the license agreement on subsequent transactions.

■ The court holds that if ARS requested an evaluation diskette and then, by keeping the live disk, agreed to purchase the copy of PC–MOS that accompanied the evaluation diskette after evaluating PC–MOS, the license agreement applies to the initial transaction. Under such facts, the contract was not formed when TSL shipped the goods but rather only after ARS opened the shrink wrap on the live version of PC–MOS which ARS had notice would result in a contract being formed.

The court's decision in this respect is not inconsistent with *Step–Saver*. The *Step–Saver* court addressed the situation in which a contract had been formed by the conduct of the parties—i.e., through the ordering and shipping of the agreed-upon goods—but the goods arrived with the license agreement affixed. In such cases, the contract is formed before the purchaser becomes aware of the seller's insistence on certain terms.

---

**1.** Under section 2–207, a party can, of course, send a confirmatory memorandum after acceptance.

With respect to the initial purchase in this case, TSL made the offer by including the live copy of PC–MOS with the evaluation diskette. The live copy appears to have been sealed in an envelope, the outside of which stated that by opening the envelope the user acknowledges "acceptance of this product, and [consents] to all the provisions [of] the Limited Use License Agreement." Def. SoF ¶¶ 11–12. ARS, therefore, accepted TSL's offer on TSL's terms when the envelope was opened. *Cf. McCrimmon v. Tandy Corp.*, 202 Ga.App. 233, 414 S.E.2d 15 (1991) (holding that warranty disclaimers that are insisted upon by the seller at the time of sale become part of the agreement between the parties).

## C. *The Subsequent Purchases*

The circumstances surrounding the subsequent purchases are very similar to the circumstances present in *Step–Saver*. *See* 939 F.2d at 95–96. ARS typically contacted TSL and ordered copies of PC–MOS over the telephone. During the order calls, the parties agreed on the specific goods to be shipped, the quantity of goods, and the price for the goods. TSL would accept the orders and promise to ship them promptly, and thereafter would ship the goods together with invoices. Although the parties apparently never discussed the license agreement, each copy of PC–MOS would have the license agreement attached to its packaging.

TSL makes three arguments as to why the license agreement is part of the agreement between the parties. First, TSL argues that the license agreement constituted a proposed modification of the original contract pursuant to U.C.C. § 2–209, and that ARS accepted the modification by opening the shrink wrap package. Second, TSL argues that the license agreement constituted a conditional acceptance of ARS's offer to purchase, and that ARS accepted TSL's conditional acceptance by opening the shrink wrap package. Third, TSL argues that if the court applies U.C.C. § 2–207 to this dispute as did the *Step–Saver* court, the court should hold that the terms of the warranty terms of the license agreement became part of the contract between the parties because the terms were not material.

### 1. *The License Agreement as a Proposed Modification Under U.C.C. § 2–209*

■ To the extent that the parties had entered into an agreement before ARS opened the shrink wrap package, the license agreement would constitute a proposal for modification of the agreement pursuant to section 2–209. Section 2–209 requires assent to proposed modifications and this court, like the court in *Step–Saver*, concludes that the assent must be express and cannot be inferred merely from a party's conduct in continuing with the agreement. ARS, like Step–Saver, did not expressly assent to the modification and the *Step–Saver* court made clear that merely continuing with a contract does not constitute assent. *Id.* at 98–99. TSL has cited no authority to contradict this interpretation of section 2–209 and this court concludes that the Third Circuit correctly decided the issue. TSL's argument based on section 2–209, therefore, is rejected.

### 2. *The License Agreement as a Conditional Acceptance*

■ TSL argues that the license agreement's terms should control because language in the license agreement expressly made TSL's acceptance conditional. Thus, TSL apparently contends that it did not enter into contracts with ARS until ARS opened each individual software package.

The *Step–Saver* court acknowledged but did not decide the issue of whether a conditional acceptance analysis applies when a contract has been established by performance. *Id.* at 101. The *Step–Saver* court assumed that a party could accept conditionally even when acceptance had been made by performance but went on to hold, after analyzing the license agreement's terms and the importance of those terms to TSL, that TSL's acceptance in that case clearly had not been conditional. *Id.* at 102–03. This court reaches the same result as the *Step–Saver* court but does not find it necessary to conduct a conditional acceptance analysis because TSL already had accepted ARS's offer before TSL presented ARS with the license agreement. In other words, the court does not believe that the license agreement in this

case could constitute a conditional acceptance regardless of its terms or the importance of those terms to TSL.

By agreeing to ship the goods to ARS, or, at the latest, by shipping the goods, TSL entered into a contract with ARS. *See, e.g., McJunkin v. Mechanicals, Inc.*, 888 F.2d 481, 488 (6th Cir.1989); *Lee v. Sheller Globe Corp.*, 661 F.Supp. 6, 7 (S.D.Miss.1986).[2] After entering into the contract, TSL was not free to treat the license agreement as a conditional acceptance, which is essentially a counter-offer.[3] The license agreement thus is best seen as a proposal to modify the contract between the parties,[4] which, as the court has discussed, was not effective because ARS never specifically assented to the proposed terms. *See* U.C.C. § 2–209; *Step–Saver*, 939 F.2d at 98–99.

■ As the court's analysis indicates, a conditional acceptance analysis very rarely is appropriate in cases in which a contract has been formed, at the latest, by performance, but the goods arrive with conditions attached. *See Bergquist Co. v. Sunroc Corp.*, 777 F.Supp. 1236, 1242 n. 4 (E.D.Pa.1991). The *Step–Saver* court based its assumption that conditional acceptance is possible in cases such as this on the language of the comment corresponding to U.C.C. § 2–207. The comment states:

> 2. Under this Article a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained in the confirmation or in the acceptance falls within subsection (2) and must be regarded as a proposal for an added term *unless the acceptance is made conditional on the acceptance of the additional or different terms.*

U.C.C. § 2–207 cmt. This court concludes that the emphasized portion of the comment simply means that if the actual acceptance in the case is made conditional, then subsection (2), which governs situations in which forms have been exchanged that do not agree, does not apply. The comment does not state that a conditional acceptance analysis should be applied in cases in which acceptance was by performance and a later writing seeks to add terms to the agreement.

The court, therefore, rejects TSL's argument that the license agreement constituted a conditional acceptance.[5] The court is very

---

**2.** An acceptance of ARS's offer occurred before arrival of the goods under either a 2–207(1) analysis or analysis under 2–206, which is the Code's general offer and acceptance provision. Under 2–207(1), a "definite and seasonable expression of acceptance" is sufficient to form a contract between the parties. This occurred when TSL agreed to ship a specified quantity of goods for a certain price to ARS. Section 2–206 indicates even more clearly that acceptance occurred at the latest through shipment of the goods. Section 2–206 states:

> (1) Unless otherwise unambiguously indicated by the language or circumstances
> (b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods....

U.C.C. § 2–206(1)(b); Ga.Code Ann. § 11–2–206(1)(b) (Michie 1982).

Because the parties have not discussed the applicability of section 2–206, the court does not rest its decision on the provision.

**3.** The case cited by TSL, *McCrimmon v. Tandy Corp.*, 202 Ga.App. 233, 414 S.E.2d 15 (1991), is distinguishable from this case because the warranty disclaimers in that case were made appar-

ent to the buyer at the time of acceptance rather than afterwards as in this case. *See Step–Saver*, 939 F.2d at 104–05 & n. 45 (discussing the different treatment of warranty disclaimers made known to the parties before the contract was entered into).

**4.** The court rejects TSL's claim that the license agreement constituted a written confirmation. The license agreement cannot reasonably be described as an attempt to embody, in one form, the agreement between the parties. In any case, to the extent that the license agreement did constitute a written confirmation, it would be treated as just that—a confirmation—rather than a conditional acceptance. *See Album Graphics, Inc. v. Beatrice Foods Co.*, 87 Ill.App.3d 338, 42 Ill.Dec. 332, 339, 408 N.E.2d 1041, 1048 (1980) (stating that a confirmatory memorandum cannot constitute a conditional acceptance).

**5.** The court notes that even if the court conducted a conditional acceptance analysis and concluded that the license agreement constituted a conditional acceptance, the license agreement still would not become part of the contract between the parties under the authority of a number of courts. These courts hold that when a counter-offer (a conditional acceptance) is made by a seller, acceptance of the goods alone is not

reluctant, in light of the purposes underlying section 2–207 and the circumstances of this case, to interpret section 2–207 in such a way that a package disclaimer constitutes a conditional acceptance even though the disclaimer arrives after the parties have entered into an agreement for the sale of goods. The court believes that it is much more consistent with the policies underlying section 2–207 to assume that package disclaimers, that arrive only after the parties have reached a general agreement under section 2–207, constitute proposals to modify the agreement.

Section 2–207 was drafted to ensure neutrality between contracting parties—i.e., to ensure that a party, usually the selling party, does not gain an advantage merely by being the last one to send a form. *See, e.g., Diamond Fruit Growers,* 794 F.2d at 1444. To accept TSL's argument in this case would allow TSL to profit by sending a last "form," the terms of which could have been included in any original agreement between the parties. *Id.* Moreover, to accept TSL's argument would allow TSL and other sellers to take advantage of the fact that purchasers often invest considerable time and money before ordering goods, and, therefore, are somewhat less likely to return goods once they arrive. *Cf. Step–Saver,* 939 F.2d at 102 (stating that this might be true). In addition, the realities of the workplace sometimes might be used unfairly against purchasers if TSL's argument were accepted. In some cases ordered goods might never even be seen by the particular department or employee charged with ordering the goods or the goods might be needed as soon as they arrive. Requiring the seller to discuss terms it considers essential before the seller ships the goods is not unfair; the seller can protect itself by not shipping until it obtains assent to those terms it considers essential. *See Diamond Fruit Growers,* 794 F.2d at 1445. Finally, to the extent that the court's decision results in important terms such as warranties being implied by the Code, no harm to public policy is done because the implied

terms of the code are presumably equitable. *See id.*

3. *TSL's Argument that the Terms of the License Agreement Were not Material and, therefore, Automatically Are Incorporated into the Party's Agreement*

■ In *Step–Saver,* TSL argued, as it does before this court, that the warranty terms included in the license agreement are not material terms and, therefore, pursuant to section 2–207(2), the terms automatically became part of the agreement between the parties. The *Step–Saver* court rejected this exact argument and so does this court. *Step–Saver,* 939 F.2d at 105; *see also Sunroc Corp.,* 777 F.Supp. at 1248.

### Conclusion

Thus, the court concludes that the terms of the license agreement are not applicable. In all material respects, the subsequent purchases in this case are equivalent to the purchases in *Step–Saver.* This court finds that regardless of whether the terms of the license agreement are treated as proposals for additional terms under U.C.C. § 2–207, or proposals for modification under U.C.C. § 2–209, the terms of the license agreement are not a part of the agreement between the parties. *See* U.C.C. §§ 2–207(2)(b); 2–209. Having not expressly agreed to the terms of the agreement, ARS was not bound by those terms.

Partial summary judgment in favor of ARS, therefore, is appropriate on the issue of whether the license agreement was part of the contracts between TSL and ARS subsequent to ARS's initial purchase of PC–MOS.

IT IS ORDERED granting Plaintiff ARS's partial motion for summary judgment with respect to the subsequent orders of PC–MOS, and denying ARS's motion with respect to the initial purchase of PC–MOS (Doc. 15).

---

sufficient to establish assent by the offeror to the terms of the counter-offer. *See, e.g., Ralph Shrader, Inc. v. Diamond Int'l Corp.,* 833 F.2d 1210, 1215 (6th Cir.1987); *Diamond Fruit Growers,* 794 F.2d at 1443–44. If the sole evidence of

assent is from the conduct of the party in proceeding with the transaction, then these courts generally define the terms of the parties' agreement under section 2–207(3). *See, e.g., Diamond Fruit Growers,* 794 F.2d at 1444.

IT IS FURTHER ORDERED granting Defendant TSL's partial cross-motion for summary judgment with respect to the initial purchase of PC–MOS, and denying TSL's motion with respect to all subsequent orders (Doc. 24).